ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.*

WYNNE HOOP & COOPERAGE COMPANY.

Opinion delivered January 7, 1907.

| 81 | 373 |
|----|-----|
| f81 | 342 |

| 81 | 373 |
|----|-----|
| f86 | 182 |
| 87 | 303 |

| 81 | 373 |
|----|-----|
| 89 | 410 |

1. CARRIER—FAILURE TO FURNISH CARS.—A complaint, in an action against a railroad company for failure to furnish cars for shipment, in which it was alleged that plaintiff placed a lot of elm sawlogs along defendant's track for shipment, and made repeated demands of defendant for cars upon which to load and ship the logs, which defendant failed to supply, states a cause of action. (Page 385.)

2. SAME—ADMISSIBILITY OF EVIDENCE.—An allegation in a complaint, in an action against a carrier for failure to furnish cars to a shipper, that the shipper demanded the cars of the carrier was sufficient to let in proof as to the agent on whom demand was made and that such agent had authority to furnish cars. (Page 385.)

3. PLEADING—DEFECT CURED BY VERDICT.—Where defendant goes to trial on the merits of a case upon proofs introduced without objection which supplied any defects in the complaint, the error in overruling a demurrer to the complaint was cured after verdict. (Page 386.)

3. CARRIER—LIABILITY FOR FAILURE TO FURNISH CARS.—A railroad company is responsible for the deterioration of sawlogs tendered for shipment, where such deterioration is due to its failure to furnish cars for shipment. (Page 387.)

4. SAME—DUTY TO FURNISH CARS.—It is the duty of common carriers to furnish transportation facilities for such goods as they undertake to carry to all who apply therefor in the regular and expected course of business; but they are excused for not having anticipated an unprecedented press of business. (Page 388.)

5. SAME—DUTY TO FURNISH CARS.—It is the duty of a carrier to furnish transportation facilities for such goods as it undertakes to carry to all who may apply for same in the regular and expected course of business; but where there is an unprecedented press of business, the carrier is excused for not having anticipated it. (Page 388.)

6. SALE—CONSTRUCTION OF CONTRACT.—An agreement which recites that C is to have all the timber controlled by A and B, who, for an

agreed price, agreed to haul same and load on board the cars, is an agreement for a present sale of timber. (Page 389.)

7. Evidence—oral testimony in aid of writing.—Where the memorandum of a contract does not state the entire contract, it was not error to admit oral evidence of what the entire contract was. (Page 389.)

8. Carrier—rule—waiver.—A carrier may waive the nonobservance by shippers of its own rule requiring demands for cars for shipment to be in writing. (Page 391.)

Appeal from Cross Circuit Court; *Allen Hughes*, Judge; affirmed.

### STATEMENT BY THE COURT.

The complaint, after alleging the incorporation of plaintiff, is as follows:

"That the plaintiff was owner of a lot of elm sawlogs placed along defendant's tracks at Crawfordsville, Arkansas, during the months of September, October, November and December, 1903, for shipment to its sawmill located at Wynne, Cross County, Arkansas; that during the said months plaintiff had made often and repeated demands for cars upon which to load and ship out logs; that it received only an occasional car, which it used as best it could; that it made repeated demands for cars during the months of February, March and April, 1904, but defendant company neglected and carelessly refused to furnish a sufficient number of cars and negligently permitted 312,000 elm logs and timber of the value of $6,377.60 to remain alongside its tracks at Crawfordsville from January 1, 1904, to May 1, 1904, a period of four months. That, by reason of defendant's refusal to furnish said cars, said logs and timber deteriorated to the amount of ninety per cent. of its value, whereby plaintiff was damaged in the sum of $6,377.60, for which it prayed judgment."

Appellant, defendant below, moved to make this complaint more definite and certain as follows:

1. By stating the amount or quantity and value of the logs named placed along defendant's track at Crawfordsville, Arkansas, during the months of September, October, November and December, 1903, for shipment, and to give an itemized and detailed statement of such logs, where and the time when placed.

2. By stating the particular days or time when plaintiff made orders for cars; whether said demands were in writing or

otherwise, and, if so, by exhibiting copies of said written demands; and, if verbal, by stating the time when, where and upon whom the demands were made and the number and kinds of cars called for and names of the agents of the railway company upon whom demands were made.

3. By stating the date and time when cars were received and the number thereof.

4. By stating the number and capacity of the cars demanded and the number and capacity of the cars received from defendant.

5. By stating specifically the terms of the contract between plaintiff and defendant, if any, as to furnishing cars for shipment of logs during the time complained of.

In response to this appellee filed the following:

"1. In response to paragraph No. 1 of said motion plaintiff says that it placed more than 312,000 feet of logs along the side of defendant's track at Crawfordsville from September 1 to December 31, 1903, but in this cause only complains of the failure of defendant to transport said 312,000 feet. Plaintiff can not give or furnish a more detailed or itemized statement of said logs or when so placed than to say that they were being hauled and placed in said position almost daily.

"2. In response to paragraph two of said motion plaintiff says demand was made upon defendant almost daily for cars upon which to ship said logs; that one or perhaps more of said demands was in writing, and that the original of any such written demands was delivered to defendant, and, as plaintiff believes, is now in its possession, and plaintiff has no copies or copy thereof; one of said written demands was made on or about November 1, 1903, and was for one car daily until all of said logs were shipped. In said demand plaintiff did not ask for or demand any particular kind of car upon which logs could be shipped and offered to receive them at any time or in any numbers.

"3. Plaintiff can not now state the date or time when it received cars from defendant for shipment of such logs or lumber, but says defendant has a complete record of the time and place when said cars were offered and placed and used.

"4. In response to paragraph four of said motion plaintiff says that it believes that about 78 cars of usual and average capacity would have been required to ship said logs, and that

long after said demands for cars were made, and long after the expiration of a reasonable time after said demands, defendant did furnish cars in about said numbers, plaintiff believes, but can not state the capacity thereof.

"5. In response to paragraph five of said motion plaintiff says that in March, 1903, defendant specifically agreed to ship all of said logs to Wynne on or before June 1 of said year, but failed so to do until in August of said year, but at other and many times defendant promised to furnish cars for said shipments, but plaintiff can not give dates of said many and repeated and violated promises."

Plaintiff further states that all the information sought by said motion is in possession of said defendant, and most thereof is a matter of record in the offices of defendant.

Appellant renewed its motion to make more definite and certain. The motion was overruled, and exceptions saved. Appellant then demurred to the complaint. The demurrer was overruled, and appellant saved exceptions to the ruling. Appellant then answered as follows:

1. It denied each and every allegation in the complaint specifically, and especially the ownership of the logs.

2. It denied that any loss or detriment in value of any timber and logs was the result of any negligent act or default on the part of the defendant railway company, or that it was in any manner the proximate cause of any such loss or deterioration.

3. It charged that, if there was any such loss or deterioration in value of such logs or timber, same was caused and contributed to by the carelessness and neglect of the plaintiff, its servants and employees, together with other persons with whom plaintiff had contracted in regard to furnishing and disposition of said timber and logs.

By an amended answer defendant said that if plaintiff suffered any damage, loss or deterioration in value of its timber and logs, it was not occasioned by any neglect of failure on defendant's part, but that it did all in its power to furnish cars without discrimination as to its customers or places, and defendant furnished all cars as fast as possible without any discrimination.

During the trial, on the cross-examination of witness

Eldridge, secretary of plaintiff's company, the following contract was read to the jury:

"Wynne Hoop & Cooperage Company,
"Wynne, Ark., Sept. 21, 1903.

"This is to certify that we, Dolph Smith and...........
of Crawfordsville, Arkansas, agree to let the Wynne Hoop & Cooperage Company of Wynne, Arkansas, have all the timber controlled by us, and further agree to haul same and load on board cars within fifty miles of Wynne, Arkansas, for the sum of $10 per thousand, said timber to be hauled as fast as possible, and said timber being good elm, and further agree not to sell any elm timber to anyone else before the 1st of January, 1904. The Wynne Hoop & Cooperage Company hereby agree to furnish the sum of $600 to the said Dolph Smith and J. A. Thomas, in advance, on this timber, and to retain $100 per week from their payroll thereafter, until said sum has been paid. $600.

[Signed] "Wynne Hoop & Cooperage Company.
"By Geo. W. Eldridge, Secretary.
[Signed] "Dolph Smith."

Witnesses, over the objection of appellant, were permitted to testify that under the contract the title to the logs vested in the Wynne Hoop & Cooperage Company, "when it scaled them and put its stamp on them on the ground at the spur." Witnesses, over objection of appellant, were also permitted to testify that it was a uniform custom in logging localities and the locality of Wynne and Crawfordsville that the title to the logs passed to the purchaser thereof when they were "taken up and stamped and the advancement made, notwithstanding the fact that in the contract the sellers were to load them."

There was testimony to the effect that appellee advanced $7 per thousand upon these logs when they were delivered on the ground at the side track. Appellant preserved its exceptions to all the above testimony.

The testimony of the secretary of the appellee is as follows:

The plaintiff (appellee) entered into the contract (set out *supra*) with Smith and Thomas. Under the contract Smith and Thomas delivered the logs at Crawfordsville; that the logs were the property of the plaintiff; that repeated demands

were made both at Crawsfordsville and Wynne for cars. "I demanded cars almost daily from September 1, 1903, to July 21, 1904. There were about 312,000 feet of logs on the ground at Crawfordsville May 1, 1904. There were ample facilities for loading the logs at Crawfordsville and unloading them at Wynne. The railway company did not require payment of freight in advance. Logs were placed on the side track from about September 1, 1903, to January, 1904. We hauled in September, October, November, December and some in January. The damaged logs began showing up about the first of March, and we afterwards found that they were really worthless. We could not ascertain their condition at Crawfordsville, but had to saw them first; there was but little timber that would make marketable hoops. The logs were damaged 80 per cent. by reason of their not being shipped at the proper time. Mr. King is superintendent of transportation of the defendant, and has his office at Little Rock. I met him at Wynne, and he asked me for information, and I told him that the logs would have to be delivered at our mill rapidly then, and this was the first of April. I told him why, and he promised to move them by the first of the month. He did not do so. From May 1 to July 1 we received and shipped seventy-eight cars with 312,000 feet. I did not personally demand cars at Crawsfordville, but Thomas and Smith told me, in the presence of the agent there, that they had made demands for cars, and I believe a written notice was given for one hundred or two hundred cars. Our superintendent went to Crawfordsville, and scaled and branded the logs, and took them up as we do when making advances on them. Then Thomas and Smith would load the logs. Smith and Thomas without their derrick could load four cars per day with six men. They had chains, wagons, mules and men. When cars arrived, they stopped hauling and loaded. It was the duty of plaintiff and of Thomas and Smith to procure cars. We paid the full amount of $10 per thousand to Smith and Thomas. From September 9 to January 23 we received 143 cars. We advanced $7 per thousand upon delivery of the logs upon the ground at the sidetrack. We received cars from September 1903, to April, 1904 as follows: September 17, October 4, December 7, January 13, February 11, March 4. An elm log will remain in the weather two or three months without be-

coming sour or spoiled. There were three places at Crawfordsville for loading logs."

The superintendent of the company, whose duty it was to scale the logs, keep time, make pay rolls, and see that the timber was manufactured, among other things, testified as follows:

"I recollect those logs. They were elm. I saw them at Crawsfordsville. They were unloaded as near the railroad track as could be, and I know how logs should be placed for loading. These were conveniently placed. There were two or three places for loading. There are skidways there, and there are other places where the logs could be rolled on to the cars. Some of the logs were placed back away from the track because there were so many of them. In loading those that came in first and were placed nearest the track were loaded first. Smith and Thomas loaded at every opportunity. I was with Smith and Thomas several times when they demanded cars from the agent. They wanted and needed all the cars they could get. The agent told them he had made requisition for cars, and would get them as soon as he could. About the 1st of January, 1904, as near as I can remember, I know there was a written request made by Thomas for one hundred cars. We did not get them. The logs were on the track. The plaintiff could unload all the cars they could get. Mr. Smith, the chief dispatcher at Wynne, was the representative of the defendant with whom the matter of furnishing cars was taken up. He had charge of that matter. He would promise to furnish cars within ten days, but they were not furnished. On some occasions he said they did not have them, and on others said they could not furnish cars at Crawfordsville to haul logs for two dollars per thousand when they could haul piling north on long hauls and get seventy-five and a hundred dollars for it. It is thirty miles from Wynne to Crawfordsville. There is one local train daily that hauls logs. Through freights do not haul them. The logs were delayed at Crawfordsville, and got sour and brittle, and the life was gone. The damage to them was 80 per cent. of their value. I thought in sawing that the damage was 60 per cent., but 20 per cent. more damage developed after shipment. When they arrived at the cooper shop, and were going into barrels, they were shipped back, and I saw some of them in the back yard. I examined the hoops not shipped, and the

damage to them was the same as that claimed upon those that were shipped, and the hoops were alike. Timber should be cut when the sap is down, if it is to remain out any length of time, that is, from the middle of September until spring; these logs were cut from about the middle of September up to January. The weather was fine. I can not tell the amount of logs on the railway track at any given date. I know in January when they were through hauling there were about 500,000 feet on the siding. We finally received all the logs. They began coming in September, 1903. They commenced loading as soon as they hauled any. I know that some cars were furnished and not loaded for several days, but they were pushed down where they could not be got at to finish loading them. I do not recollect when the derrick came, but they could not use it because the railroad company had promised to raise the wires, but did not do so for two weeks. I do not know the date, but it was after the first of January. Sometimes they used the same men in loading that they did in cutting and hauling, and at other times would get other men. Sometimes Smith and Thomas had two or three men, and at other times eight to ten. It is not necessary to have more than three men to load a car without a derrick. The logs were piled two or three on top of each other. The ground was flat and level."

J. A. Thomas, for plaintiff, testified as follows: "I live at Earle, and am the same Thomas mentioned in the contract with plaintiff and Thomas and Smith. I bought Smith out early in 1904. Both before and after that I made demands for cars. I had an order in for one hundred cars. They made me sign an agreement to take a car a day. I did not need but a car or two a day. They made me sign an agreement to take a car a day for one hundred days. That was about the time I began for myself. I could not get anything done. They would not set in any cars where I could load them. I have seen them come in and kick cars down out of the way and leave them for six or eight days before I could get them back. "The railroad people (probably meaning the agent) never did exact me to pay him anything for the cars, but I would have to pay the other fellows." Q. "What other fellows do you mean?" A. The people who were running the local trains. They told me I was not paying enough. They said: 'You see the other people are getting cars.' Q. Did you say

the agent referred you to the train men? A. Yes, sir. Q. Did you go to them? A. They came to me." "There was never but three cars with any demurrage due. I was loading one car when they kicked it out. It was about one-fourth loaded, and they charged me demurrage on that one. I could not get it back to load it. They pushed it 115 or 120 yards on the switch. When I signed the written order, I told them I wanted a car a day, but I did not get them that often. The agent was Mr. Bunn. I did not delay loading, waiting to get my derrick up. I was feeding my mules at $2.50 per day, and trying to load every day. In the fall of 1903, and up to January, the weather was nice, and you could haul at Crawfordsville as well as anywhere. We had no more time to load in January than at any other time. We used the hauling teams and could load at any time." Appellant objected to the testimony of the above witness because the court permitted it to be introduced after both parties had closed their evidence the day previous. But the record shows that an attachment had been issued for this witness, and appellee had given notice that it would introduce him when he appeared. Smith testified for the plaintiff substantially the same as Thomas.

The appellant adduced evidence tending to prove that the rules of the company require that orders for cars must be in writing, stating how many cars are wanted, what kind of cars are wanted to be loaded, and destination, routing, etc.; that there were no written orders by appellee or Smith and Thomas for cars; that verbal requests were made; and that appellant's agent did not object to verbal requests, but in response thereto furnished cars. The list of cars furnished appellee at Crawfordsville showed that sixty cars were furnished between September 9, 1903, and April 30, 1904. The chief dispatcher of appellant at Wynne said that there was no written order for cars to ship logs from Crawfordsville, but he also said that he knew that the Wynne Hoop & Coopage Company wanted cars to ship logs to Wynne, because Eldridge and Mack would come in and speak to him for cars, and he would order all he could for them.

There was other testimony on behalf of the appellant tending to show that appellant furnished to appellee cars as fast as appellee could load same, and the delay in the shipment of the logs in controversy was not caused on account of failure to furnish ap-

pellee cars, but on account of the failure of appellee to load the cars after they were furnished. There was testimony also on behalf of the appellant tending to show that the delay and loss of the logs and consequent damage to appellee was caused by the manner in which appellee loaded its logs, and not by appellant's failure to furnish cars.

The appellant presented requests for instructions numbered respectively from 1 to 13. The court refused to grant 1, 2, 3, 8 and 9 of these requests, and modified and gave as modified 3, 8, 9 and 11 of appellant's requests; appellant objecting to the refusal to give its requests as asked and objecting to the court's modifications and to the giving of the instructions as modified.

The court on its own motion gave the following:

"1.   If it was understood between Dolph Smith and the plaintiff that the title to these logs should pass to the plaintiff when they were delivered at the point of shipment branded, and the advancement of seven dollars per thousand was made upon them, the logs thereupon became the property of the plaintiff, and the deterioration in value of the logs thereafter, if any, was the loss of the plaintiff. On the other hand, if the logs were not to become the property of the plaintiff until loaded upon the cars, any deterioration on them between the time of their deposit at the place of shipment and loading on cars would be the loss of Smith, for which there can be no recovery in this case.

"No. 2.   If they were plaintiff's logs, and they were delivered for shipment at a usual point of shipment on defendant's line of railway, and plaintiff thereupon requested defendant to furnish cars to transport them to Wynne by request definite as to the time and number of cars wanted, it was the duty of defendant to furnish such cars within a reasonable time after such request."

Court's instruction not numbered:

"If you find for the plaintiff, and find that the logs deteriorate in value by reason of the failure to furnish cars, you will assess the damages at such sum of money as would represent the difference in value between the value of the logs at Crawfordsville at the time the cars should have been furnished, if such cars had been furnished as stated in these instructions, and their value at the time the cars were furnished, in so far as such deterioration arose from the failure to furnish cars. If the deterioration re-

sulted from any other cause, defendant is not liable for it; and if there was a deterioration from any other cause, you will deduct from said difference the amount of said deterioration from such cause.

"4.   The duty on the part of defendant as a common carrier to furnish plaintiff with cars sufficient to transport timber was not an absolute one; but its only duty was to furnish with reasonable promptness after demands made therefor, and to exercise reasonable diligence and care to provide transportation facilities to meet any such requirements as might be made in the usual course of its business, considering the general demand for such cars and the general condition of freight traffic. Defendant was not obliged to discriminate against any other shippers or other places nor supply plaintiff with any sudden demand for cars.

"5.   If it was the custom of the plaintiff to accumulate logs or timber upon or near the railway right of way for shipment, and if this was not a delivery of such logs or timber to the defendant, and if, after the demand for cars was made, the defendant used such diligence as an ordinarily prudent person would have done under the circumstances to procure cars for such shipment, considering the general demand for cars and the general freight traffic, then your verdict should be for the defendant.

"6.   If the general freight traffic was congested at Wynne and upon the railway therefrom to Memphis, embracing the station at Crawfordsville, and if such congestion of traffic was such that cars could not be furnished for plaintiff to transport the logs and timber in question, without discriminating against various other shippers and persons interested in shipments in such congested conditions, then your verdict should be for the defendant.

"7.   If you should find for the plaintiff, there must appear from a preponderance of the evidence the extent of its damage; and you are not at liberty to guess at it, but must find it from the proof. The burden of proof is upon the plaintiff upon all issues in this case; and if it has failed to establish its case by a preponderance of the proof as to negligence on the part of the defendant, or as to the measure of damages, then your verdict should be for the defendant.

"11.   Even if you should find that there was negligence on the part of the defendant in this case, yet if there was any negli-

gence whatever, in any manner or degree, on the part of the plaintiffs or any persons acting for them, causing or contributing to any damage complained of as to the logs and timber claimed by plaintiff, then the plaintiff can not recover."

This was modified by adding the word "therefor" and given as modified.

"12.   If the Wynne Hoop & Cooperage Company and Dolph Smith had a contract sale of the logs and timber in question, and such timber and logs were to be loaded on the cars by Smith or persons under his supervision, or under contract with him, other than the Wynne Hoop & Cooperage Company, and if the Wynne Hoop & Cooperage Company was not to receive such logs and timber until loaded on cars, and it was not the property of the plaintiff, it can not recover.

"13.   The mere fact of the Wynne Hoop & Cooperage Company causing marks to be placed on the logs in question, if they did so, is not in itself sufficient to constitute a delivery or complete a sale to the Wynne Hoop & Cooperage Company before being loaded upon the cars, but is only a circumstance to be considered by you, together with the contract, and all other circumstances relating thereto, as to whether or not delivery was to be made upon the cars as a completed sale to plaintiff."

The verdict was for $2496.

A motion for new trial preserving all the exceptions and claiming that the verdict was excessive was overruled, and this appeal prosecuted.

*B. S. Johnson,* for appellant.

1.   It was an error to overrule appellant's second motion to make the complaint more definite and certain.   Pomeroy's Rem. & Rem. Rights, § 552; 59 Ark. 169; 69 Ark. 363; 66 Ark. 278; 85 S. W. 85; 22 Ark. 227; 52 Ark. 380; 61 Ark. 562.

2.   The complaint does not set up facts sufficient to constitute a cause of action against the defendant.   It would be an injustice to parties litigant to adjudicate their rights upon an issue never raised in the court below, and the plaintiff can not be permitted to recover on a case not made in the complaint.   The *allegata* and *probata* must correspond.   46 Ark. 96; 29 Ark. 501; 40 Ark. 309; 69 Ark. 586; 75 Ark. 66.   To allege that plaintiff

caused its property to be placed along the side tracks of defendant, and left same there awaiting the furnishing of cars until, by reason of exposure to the weather, it was damaged, etc., does not constitute a good cause of action, or fasten any liability upon the defendant.  56 Ark. 288.

3.  Under the contract between appellee and Smith title did not vest in appellee until the logs were loaded on board the cars, and the court should have so instructed the jury.  Construction of a contract is one of law for the court, and not of fact to be left to the jury.  20 Ark. 590; 25 S. W. 1077; 106 Mass. 216; 46 O. St. 30; 52 Fed. 359.

4.  The court erred in permitting the introduction of inadmissible testimony, the effect of which was to vary, contradict, or add to the terms of the written contract.  12 Met. 257; 50 Ark. 395; 75 Ark. 165.

*Smith & Smith* and *Lamb & Caraway,* for appellees.

1.  The response to the motion to make the complaint more definite and certain was treated as an amendment, and that, taken with the complaint, undoubtedly states a cause of action. 76 Ark. 220; *Ib.* 66; 69 Ark. 584; 52 Ark. 378.

2.  If the writing between appellee and Smith is to be treated as a bill of sale, the title of the logs passed at its date, to appellee. 62 Ark. 592; 68 Ark. 308.  Where a writing does not purport to contain the entire contract, oral proof of other provisions in it may be made.  Beach on Mod. Law, Cont. § § 31 and 722. Where a contract, either oral or written, or partly oral and partly written, is silent as to any essential feature, the custom of the trade may be proved.  *Id.* § 752.

WOOD, J., (after stating the facts.)  The complaint and response to the motion to make more definite and certain, which was treated as an amendment to the complaint, stated a cause of action. The complaints which failed to state a cause of action for failing to furnish cars in the case of *St. Louis, I. M. & S. Ry. Co.* v. *Carl-Lee,* 69 Ark. 584, and *St. Louis, I. M. & S. Ry. Co.* v. *Moss,* 75 Ark. 66, differ in essential respects from the original complaint in this case.  Here the allegations is that "the plaintiff had placed a lot of elm sawlogs along defendant's track for shipment, and had made often and repeated demands of defendant for cars upon

which to load and ship out logs." In the cases *supra,* while substantially the same allegations were made as to the demand for cars for shipment, it is specifically alleged that the demand was made upon certain agents of the company, naming them, and there was no allegation that these agents had authority to furnish cars, or that it was within the scope of their employment to furnish cars, or to receive notice of the demand for cars on the company. In such cases we held that there was no allegation of a tender for shipment or a demand for cars upon an agent authorized to furnish same. But here the allegation is not only that the logs were placed for shipment along the tracks, but that demand was made for cars upon the *defendant.* The pleader did not undertake to specify the particular agents upon whom demand was made. If he had done so, it would have been incumbent upon him to have also alleged that receiving the notice for or furnishing the cars was within the scope of their employment. But here the general allegation that demand was made of the defendant, coupled with the allegation that the logs were placed along the tracks of the defendant at Crawfordsville for shipment, was sufficient to show a tender for shipment and a demand upon the appellant, whose duty it was to furnish cars. An allegation that plaintiff made demand of defendant was sufficient to admit proof as to the agent on whom demand was made, and that such agent had authority to furnish cars. But the case at bar differs essentially also from the cases named *supra* in that in both those cases the railway company stood on its demurrer to the complaint. Here the appellant answered over and went to trial on the merits. Even if the complaint as amended was still defective, the appellant's answer, taken in connection with the allegations of the complaint, tendered an issue before the jury as to whether or not appellant negligently failed to furnish cars which resulted in appellee's injury and damage as set forth in the complaint. Having gone to trial on the merits of this issue upon proofs introduced without objection, which supplied any defects in the complaint, the error, if any, in the court's ruling was cured after verdict. *Sevier* v. *Holliday,* 2 Ark. 512; *Davis* v. *Goodman,* 62 Ark. 262, and other cases collated in 2 Crawford's Digest, p. 714, "k."

The whole case having been developed on the proof, the only questions here are those presented by the assignments of

error in the rulings of the court relating to the admission of testimony, the declarations of law, and the sufficiency of the evidence to support the verdict.

Second.  The complaint, after alleging that appellee placed logs along appellant's track for shipment, and its repeated demands upon appellant for cars on which to "load and ship same," and that the appellant neglected and carelessly refused to furnish a sufficient number of cars, etc., proceeds to charge: "That by reason of defendant's refusal to furnish said cars said logs and timber deteriorated in value, from exposure to the weather and from rot, to the amount of ninety per cent. of its value, or a total sum of $6,377.60; *that, by reason of the negligent refusal of the defendant company* to so furnish cars as aforesaid, this plaintiff is damaged, etc." These allegations were sufficient to charge that the negligence of the company in failing to furnish cars was the proximate cause of appellee's injury. The testimony also was sufficient to warrant the jury in finding that the delay of appellant to furnish cars was the direct cause of the damage sustained by the appellee.  Appellant contends that these allegations of the complaint show that "exposure to the weather" was the proximate cause of the injury, and that the complaint therefore fails to state a cause of action. The case of *Railway Company* v. *Neel,* 50 Ark. 279, is cited and quoted from to support this contention. But the facts in that case differentiate it from this.  That was a suit for damages from alleged breach of contract to ship cotton. But the proof showed in that case, and the court held, that the damage to the cotton unshipped was not caused by a breach of contract to ship, but was caused by "exposure of the cotton to mud and rain."  The court said: "If the cotton had been properly cared for, the delay would not have caused any deterioration in quality, and the market price is shown to have advanced pending the delay.  The only injury in proof came from the failure to properly care for the property." But in this case the injury in proof did not come from the failure of appellee to properly care for the property. On the contrary, the jury were warranted in finding that the logs were properly placed and properly handled, that appellee tendered the logs to appellant for shipment, and took such care

for their preservation during the delay of the railway company to furnish transportation as ordinary prudence in the handling of such property in the usual course of business demanded. It must be taken as a matter of common knowledge that cotton and sawlogs differ in their inherent qualities. Cotton can be stored and thus protected from the elements, and a short delay in its transportation would not cause decay and a consequent depreciation in value. It was shown here that the only value of the elm timber consisted in its use for hoops, and to be valuable it had to be manufactured into these before the logs decayed. After the elm logs had been cut for a period of three months they would begin to turn sour at the ends, become brittle, worms would infest them, the bark would peel off, and the process of decay go on. Hence any delay in shipment which prevented their manufacture into hoops before this process of decay began would directly contribute to and be the proximate cause of any deterioration in value of the timber. If shipped promptly, it could be manufactured into hoops before the decay produced by delay took place. The logs in this suit were cut during the months of September, October, November and December, 1903. The logs cut during this period would keep for a period of three months. Decay in the logs unshipped began to be noticed about the first of March, 1904, and on May 1, 1904, there were about 312,000 feet of elm logs left on the ground at the station of Crawfordsville for injury to which on account of delay in shipment, caused by the alleged failure of appellant to furnish cars, this suit was brought.

This court in recent cases has declared the duty of common carriers, by the common law and by statute, to furnish transportation facilities for such goods as they undertake to carry to all who may apply for same in the regular and expected course of business. Where there is an unprecedented and unexpected press of business, such as the carrier could not by ordinary prudence in the usual course of the traffic have contemplated, he is excused for not having anticipated and provided against such extraordinary conditions. *St. Louis S. W. Ry. Co.* v. *Clay County Gin Co.,* 77 Ark. 357; *Choctaw, Oklahoma & Gulf R. Co.* v. *State,* 73 Ark. 373. See also *Little Rock & Ft. S. Ry. Co.* v. *Oppenheimer,* 64 Ark. 271; *Little Rock & Ft. S. Ry. Co.*

*v. Conatser,* 61 Ark. 562.  See also Hutch. on Car. § 292; 4 Elliott, Railroads, § 1470; 6 Cyc. 372, and cases cited in note.

The court declared the law bearing on these questions in instructions numbered four, five and six given at appellant's request.  There was evidence to sustain the verdict, and the verdict was not excessive.  The evidence tends to show that there was on the ground at Crawfordsville, May 1, 1904, 312,000 feet of elm logs.  At this time decay had already commenced. As we understand the pleadings and proof, appellee contends that it was the failure of appellant to furnish cars for this 312,000 feet before the decay set in that caused its damage. It would have taken 78 more cars than appellee received up to May 1, 1904, to have shipped these logs, for a carload was 4,000 feet.  The proof showed that the logs at Crawfordsville, undamaged, were worth $10 per thousand feet or $3,120.  The jury might have found from the evidence that the logs were damaged on account of the delay in shipment to the extent of 80 per cent. of their value, or $2,496, the amount of the verdict.

Third.  There was no prejudicial error in submitting to the jury the question as to when the title of the logs in controversy passed under the contract between appellee and Smith and Thomas.  The verdict of the jury was in accord with the proper construction of the contract.  The purpose of the contract, as shown by the proof, was to enable appellee to control the entire output of elm logs cut by Thomas and Smith or controlled by them.  Under the written agreement the court should have told the jury that the title to the elm logs that should be got out by Smith and Thomas passed to appellee on the day the written agreement was executed, September 21, 1903.  It was a present sale of the timber with an agreement for future services concerning same.  *Lynch* v. *Daggett,* 62 Ark. 592; *Anderson-Tulley Co.* v. *Rozelle,* 68 Ark. 308.  Wherever the logs were cut within fifty miles of Wynne by Thomas and Smith, they belonged to appellee. But Smith and Thomas were to haul and load them on the cars. But the writing was no more than a memorandum, as shown by the evidence *aliunde.*  It did not contain all the terms of the contract between the parties.  The evidence showed that there was an agreement as to the dimensions of the logs, that they were to

be scaled weekly, stamped, and when this was done $7 per thous-
and feet was to be advanced on them.   The contract is silent as
to these things, yet they were essential features of the contract as
a whole, and show that the writing did not purport to be, and was
not, the whole contract.   The court therefore did not err in per-
mitting oral evidence of what the entire contract was.   Nothing
in the oral proof contravened the terms of the writing, but only
showed that it did not contain all the provisions of the contract
between the parties.   If it was error to prove the custom of the
trade as to when the title to logs passed, it was not an error of
which appellant can complain; for, as we view the writing, the
jury construed it as the court must have done, had it not sub-
mitted the question to them.

Fourth.   We find no prejudicial error in the refusal of the
court to give appellant's eighth and ninth prayers as asked, and
in giving them as modified.   The substitution of the words "logs
less liable to damage" for the words "newer and fresher logs and
timber" in the eighth prayer conveyed the same idea intended by
the words in the prayer as asked, but in more appropriate terms.
The addition of the words, "but such method and order of load-
ing, if it occurred, would not bar a recovery unless plaintiff had
reason to believe that defendant would not furnish a sufficient
number of cars to remove all the logs before damage thereto
would occur," was not prejudicial.

Witness Coleman testified that the people at Crawfordsville
had a number of logs "piled along at a certain skidway, and when
they were loading they would take up the logs that were handy
right next to the skidway and then haul again and bring the logs
next to the skidway and load these, and in that way cause the
fresh logs to be hauled out first."   But the witness, although
asked, does not identify appellee's agents as the people who were
loading in that way.   The positive proof on the part of appellee
was to the effect that the logs were loaded in the order in which
they were hauled, or in such manner as to ship out first the logs
most liable to injury.   Moreover, there was abundant evidence
from which the jury might have found that appellant, by its oft-
repeated promise to furnish cars, gave appellee reason to believe
that no injury to his timber was to be apprehended from a delay
in its shipment.   Substituting the words "for the timber so dam-

aged" for the word "therefor" in the ninth prayer did not change its meaning. There was no error in the court's charge. It fully presented the law applicable to the facts proved.

Fifth. While the evidence tended to show that appellant had a rule requiring demands for cars to be in writing, and that appellee did not observe this rule, the testimony also tends to show that the observance of this rule on the part of appellee was waived by appellant. No written demands were insisted upon by appellant. Moreover, there is no assignment of error in the motion for new trial for failure of appellee to observe the rules of appellant requiring written demand for cars.

The record presents no reversible error, and the judgment is therefore affirmed.