**WILLINGHAM et al. v. SELIGMAN et al.**

No. 12654.

United States Court of Appeals
Fifth Circuit.

Jan. 19, 1950.

Rehearing Denied Feb. 20, 1950.

Ralph W. Currie, Dallas, Tex., for appellants.

Pat Legan, San Antonio, Tex., Arthur W. Mueller, San Antonio, for appellees.

Before HUTCHESON, Chief Judge, RUSSELL, Circuit Judge, and DOOLEY, District Judge.

DOOLEY, District Judge.

The appellant, A. C. Willingham (herein called "carrier"), in his business as a motor carrier, during the period from on or about January 20, 1944 to on or about May 21, 1946, transported large quantities of shelled pecans, in numerous shipments, for the appellees, Julius Seligman and other members of the partnership named Southern Pecan Shelling Company (herein called "shipper"), from San Antonio, Texas to St. Louis, Missouri. The carrier has sued the shipper to recover alleged undercharges on said shipments. The gross lading of said pecans moved in 115 truckloads. The question is whether there were 115 separate shipments, as contended by the carrier, or only 57 separate shipments, as contended by the shipper. The case was tried without a jury, and the findings of fact most material presently made by the trial Judge, are stated in condensed substance below.[1]

1. The shipper, a large wholesaler of shelled pecans, had on hand in the firm's warehouse and wanted to ship from San Antonio, Texas to St. Louis, Missouri, 57 lots of 40,000 pounds or more of shelled pecans, and offered or tendered

All said findings are supported by the record. The applicable tariff published and on file with the Interstate Commerce Commission fixed a volume rate of 85 cents per hundred-weight on 40,000 pounds minimum shipments of shelled pecans between the above points of origin and destination, and a subsidiary rule provided that volume rates apply only when the volume of freight is shipped "from one point (or places within plant of one shipper) in one day by one shipper on one bill of lading for delivery to one consignee at one destination". The primary tariff aforesaid, also defines a "shipment" and includes a modifying provision, which severally read as follows:

"A shipment is a lot of freight received from one shipper, at one point at one time for one consignee at one destination and covered by one bill of lading."

"When the authorized truckload or volume minimum weight or any weight in excess of such authorized minimum weight on any shipment, cannot be loaded on one truck because of loading to full carrying capacity, the excess over the quantity that can be loaded in or on truck, shall be considered as constituting a portion of the shipment for the purpose of applying minimum weight provisions, and the truckload or volume rates applicable subject to the established minimum weights, shall be applied on the actual or authorized estimated weight of the entire shipment."

In general there is nothing peculiar about the canons of construction in dealing with freight tariffs. They are interpreted in much the same way as contracts and statutes. Where general and specific provisions overlap, the specific is deemed to be an exception to the general rule. Ambiguities are resolved against the carrier and in favor of the shipper. The shipper is entitled to the lowest published rate properly covering his tendered shipment.[2]

same to the carrier as respective single shipments, on different dates successively during the period of time between January 20, 1944 and May 21, 1946, for transportation between said points; that the only lawful way the carrier could handle a shipment of such weight was to load it in parts on at least two trucks, and it did not at any one of said times have the necessary two trucks at hand and ready to use so that a full shipment could be loaded and hauled away from the shipper's warehouse at the same time or even on the same day; that the practice adopted was to load and move a part of each of said shipments on the first truck the carrier could send to the shipper's warehouse, and then the next or some subsequent day, whenever the carrier again was able to send a truck for such use, the remainder of such shipment would be loaded thereon and moved from the shipper's warehouse; that this routine was true of all 57 shipments except one, which was divided among three trucks; that each of said shipments consisted of more than 40,000 pounds of said commodity; that when the first part of a given shipment was loaded a bill of lading form, showing that quantity and weight, but no charge, with a notation thereon "part car shipment— balance to follow", or words of like effect, was signed by the parties, and a freight bill with like contents in above particulars, as well as showing that the revenue billing would follow on completion of the entire shipment, was issued by the carrier; that when the last part of a given shipment was loaded another bill of lading form showing that quantity and weight, together with a reference to the first truckload, and a notation "completes part car shipment on (whatever date the carrier received the first truckload)", was likewise signed by the parties, and then the carrier issued a freight bill for the total amount of the freight charge and tax on the whole shipment; that the shipper was both consignor and consignee in all said shipments; that the carrier and shipper looked on said method of handling as being in reality the issuance of one bill of lading in two parts as to all of the shipments except one, and as the issuance of a bill of lading in three parts in that special instance; that the said 57 shipments were moved in 115 different truckloads altogether; that the 85 cent volume rate was charged and paid on all said shipments; that agents of the Interstate Commerce Commission who checked the carrier's records covering said shipments did not object to the above explained practice as contrary to the rule requiring volume shipments to be covered by one bill of lading.

2. Pillsbury Flour Mills Co. v. Great Northern Ry. Co., 8 Cir., 25 F.2d 66;

The pivot of the carrier's argument is the "one point, one day, one shipper, one bill of lading, one consignee, and one destination" formula quoted from the tariff and rule aforesaid. Noticeably "one truck" is not included in said details. It is contended that the premise of 57 shipments, although literally consistent with all other elements thereof, is inconsistent with the "one day" and "one bill of lading" points of the definition. This leads to the carrier's conclusion that the only tenable viewpoint must be the premise of 115 shipments which would put each shipment in a weight bracket subject to the rate of $1.17 per hundredweight. The bone of contention here is the fact that the premise of 57 shipments is founded on a split movement in parts on different days, but tied with that is the further fact that the shipper was ready, able and willing each time to ship the full quota of 40,000 pounds or more of shelled pecans the same day, and would have delivered said quantity if the carrier had been able to move it all the same day for simultaneous transportation. The carrier's theory aforesaid singles out the primary provision and discounts another important part of the governing tariff. The modifying paragraph quoted above from said tariff manifests an intent to impart some flexibility in a practical way in the construction of such tariff. Obviously that part of the tariff has no bearing on shipments which in their circumstances conform literally with the general rule of the tariff relied on by the carrier. Instead the only function it can have is to maintain the volume rate in question under certain circumstances although the shipment may not literally conform with some point of the general rule.

The general tariff rule, taken in the strictest and most literal sense, does not require movement of all the commodity in a single truck to constitute a "shipment", but on the contrary a consignment of goods may move in more than one truck and still comply with all the minutiae in the definition of a "shipment", and so the validation purpose of the companion provision supplementing the general tariff rule could not plausibly have in mind such a shipment. The said modifying provision is entirely sterile unless it means at least that the "one day" specification shall yield to the impediment of equipment inadequacies or disabilities which sometime beset a carrier, and once it is admitted that a shipment may move in parts on separate days and still hold the same favorable volume rate, then any technical distinction between the use of a unitary bill of lading or a two part bill of lading for such shipment becomes insubstantial, where there is a real oneness of the shipment. That tariff provision seems well suited to mesh with the circumstances of the shipments in question. We hold that under a proper construction of the governing tariff the applicable rate was assessed by the carrier and paid by the shipper on the shipments in question, if the shipper bona fide tendered and delivered this freight in 57 shipments. Our holding comes to much the same point of view as that stated in an administrative ruling of the Interstate Commerce Commission, Bureau of Motor Carriers, and although that ruling did not relate to any specific tariff, yet we think it sheds light on the practical framework, purpose and proper construction of volume rate tariffs, such as the one involved in this case.[3]

Boone v. United States, 6 Cir., 109 F.2d 560; United States v. Gulf Refining Co., 268 U.S. 542, 45 S.Ct. 597, 69 L.Ed. 1082.

3. "Interstate Commerce Commission Bureau of Motor Carriers
"The following is an administrative ruling of the Bureau of Motor Carriers, made in response to questions propounded by the public, indicating what is deemed by the Bureau to be the correct application and interpretation of the Act. Rulings of this kind are tentative and provisional and are made in the absence of authoritative decisions upon the subject by the Commission.
"Question:

"A motor common carrier of property publishes a commodity rate of 15¢, minimum 10,000 pounds, on a particular commodity, and a less-truck-load rate on the same commodity of 20¢ between the same points. It is offered a shipment of 10,000 pounds at the 15¢ rate, but it is physically impossible for him to carry the entire 10,000 pounds on that day.

■ The carrier challenges the finding of the trial court that the shipper effectively tendered each time in question a quantity of shelled pecans weighing 40,000 pounds and more for transportation as a single shipment. It is undisputed that throughout the interval of time herein material the shipper was shelling an average of some more than 40,000 pounds of shelled pecans per day, and that during such period the shipper's warehouse inventory of shelled pecans at San Antonio, Texas was never less than 356,904 pounds. The shipper at said time maintained a storage stock of shelled pecans for distribution from warehouses in St. Louis, Missouri, and was making these shipments to keep that stock replenished. It is also undisputed that the pinch of wartime was reflected in a shortage of trucks throughout the motor freight industry during said period. Furthermore, while the Nation was in actual hostilities Government shipments naturally had priority on all the transportation facilities of the country. The private shippers had to make out as best they could for any transportation service. The carrier had only one truck of sufficient capacity to move a freight load weighing 40,000 pounds and the use of it loaded to capacity on the public highways would have violated the penal law of Texas. In other words, the handling of any such heavy shipment all at once demanded two or more trucks. The carrier and shipper from their long course of dealing well understood that the shipper was having to split the poundage of shelled pecan freight because the carrier was unable to handle all of a full shipment at the same time. This course was a natural expedient in adjustment to the general dislocation existing at that period of time. The record shows that the custom was for the carrier to receive shipments of shelled pecans at the shipper's warehouse. In other words, the warehouse had become the accepted place of delivery rather than the carrier's own office or depot. The method in which the transportation of these shelled pecans was handled, and the records thereof made, show that the parties by common intent deemed that a full shipment was being tendered to all intents and purposes at the time the first part of each respective shipment was loaded at the shipper's warehouse. This is plainly shown in the testimony of the carrier himself,[4] and in the testimony of the carrier's agent,[5] and in the testimony of the shipper's clerk.[6] The present suit was not filed until April 12, 1947. True these respective consignments of 40,-000 pounds and more of shelled pecans were not segregated, all of each shipment, at the outset, but the first part of the shipment would be segregated from the warehouse stock when it was loaded and then the second part of the shipment would be segregated from that stock when it was loaded, so that in the interval the second part of the shipment was not physically marked

---

May the carrier transport 5,000 pounds on one day and the balance the next day and charge the 15¢ rate?

"Answer:

"This is permissible provided that the entire shipment is billed on a single bill of lading and is actually delivered to the carrier, or delivery of all thereof tendered, at one time."

4. "Q. Well, don't your freight bills show that it was all tendered to you, and a part moved in one truck and the balance moved in another; isn't that what your bills show, your way bills that you prepared yourself? A. That is what the freight bills will show."

5. "Q. Then you did know that she had 40,000 pounds available for shipment when you could pick them up? A. Yes, sir."

6. "Q. Now, did you or did you not tender him 40,000 pounds for shipment on those dates, and if you did not, please state what the circumstances were with reference to having tendered him pecans? A. Well, we knew from practice that we could not—that is nine times out of ten—that we could not load more than a truck, or get more than one truck in one day, and so it was understood that we would load that part that day, and complete it the following day or the day after. Whenever he could furnish us a truck or whenever we could get him to send the equipment down there.

"Q. Then, during this course of dealing, when you would call him and tell him that you had pecans, did you have 40,000 pounds available for shipment at that time? A. Yes, sir, we did."

or identified apart from the general stock of shelled pecans in the shipper's warehouse. But there was always almost tenfold the amount of any such shipment on hand in the warehouse stock of the shipper. No claim is made that there was ever any delay in filling out a shipment whenever the carrier in his own time sent a truck to the shipper's warehouse to receive the balance of any given shipment. Nothing is disclosed to suggest that this shipper through subterfuge and collusion with the carrier has gained the volume rate by a covinous combining of separate and under minimum shipments on the pretense that same were split parts of over minimum shipments, when in fact the shipper was not ready, able and willing to make, all at once, an over minimum shipment at any of said times. The good faith of both parties seems beyond fair doubt. In a practical business sense, and in the light of the course of dealing between the parties, a lack of literal segregation should not be accepted as fatal to a valid tender. The question of a tender must be judged from the particular factual background under review. The facts found by the trial court and the record at large fairly show a good and sufficient tender of 40,000 pounds and more of shelled pecans for shipment at each of the times in question.[7] Of course probably any transportation rate system can be misused, and it is right that deviations from standard practice should invite scrutiny, but certainly the volume rate plan may have a very proper place, when duly supervised, in the general rate structure of the transportation industry.[8] In any event we are dealing here with a particular tariff, duly published and filed with the Interstate Commerce Commission and it is the lawful guide for the purposes of this suit, and the record well rebuts any misuse of that tariff.

We hold that the carrier's suit for undercharges herein is without merit. This makes it unnecessary to pass on other questions or to notice the position of any parties except the shipper and the carrier. The judgment of the trial court is affirmed.

7. Richey & Gilbert Co. v. Northern Pac. Ry. Co., 110 Minn. 347, 125 N.W. 897; Central of Georgia Ry. Co. v. George P. Greene & Co., 41 Ga.App. 794, 154 S.E. 809; St. Louis, I, M. & S. R. Co. v. Wynne Hoop & Cooperage Co., 81 Ark. 373, 99 S.W. 375. Arthur, et al. v. Texas & Pacific Ry. Co., 27 S.Ct. 338, 51 L.Ed. 590, 204 U.S. 505.

8. Eastern-Central Motor Carriers Ass'n v. United States, 321 U.S. 194, 64 S.Ct. 499, 88 L.Ed. 668.