UNITED STATES of America, For the Use and Benefit of MAGNOLIA PETROLEUM COMPANY, Plaintiff,

v.

H. R. HENDERSON & COMPANY, C. H. Leavell & Company, Utah Construction Company, the Aetna Casualty and Surety Company, and Maryland Casualty Company, Defendants.

Civ. A. No. 1163.

United States District Court, W. D. Arkansas, Fort Smith Division.

Jan. 5, 1955.

Owens, Ehrman & McHaney, Little Rock, Ark., Roy L. Merrill, Dallas, Tex., for plaintiff.

Wright, Harrison, Lindsey & Upton, Little Rock, Ark., Smith & Hall, Marshall, Tex., for defendants.

JOHN E. MILLER, District Judge.

On August 31, 1954, the use plaintiff, hereinafter referred to as plaintiff, filed its complaint against defendants, seeking to recover the sum of $20,575.63, plus penalty and attorney's fee, which plaintiff claimed the defendant, H. R. Henderson & Company, a subcontractor, owed it for certain goods, wares and merchandise purchased by the said defendant from the plaintiff. The suit was brought under the Miller Act, 40 U.S.C.A. § 270a et seq., and the prime contractors, together with the sureties, were made parties defendant. It was alleged by plaintiff that all the goods furnished by it to the defendant Henderson were used in the performance of Henderson's subcontract with the prime contractors, C. H. Leavell & Company and Utah Construction Company, which in turn was a part of the prime contract between said prime contractors and the United States of America for the construction of certain smokeless powder magazines for the United States Naval Ammunition Depot at Shumaker, Arkansas.

The defendant, H. R. Henderson & Company, on September 23, 1954, filed its answer admitting that the charges for goods, wares and merchandise were substantially correct, but denying that all of said goods were used in connection with the contract or subcontract and denying that it was indebted to plaintiff in any sum. Included in the said defendant's answer was its counterclaim in which it alleged that it purchased certain motor oil from the plaintiff for use in connection with the construction contract; that the oil furnished by plaintiff to it was contaminated with rust or other foreign particles; that said contaminated oil caused damage to four Cummins NBH 600 motors being used by it on the job; that said damage was caused by the negligence of plaintiff, or, in the alternative, that the damage resulted from a breach of warranty on the part of plaintiff; and that it was damaged in the sum of $30,500, for which it should have judgment after deduction of the amount it owed plaintiff for the purchase price of the oil and other merchandise.

On the same date, September 23, 1954, the remaining defendants filed their answer containing substantially the same admissions, denials and allegations as were contained in the separate answer of H. R. Henderson & Company. In addition, these defendants alleged that the primary liability, if any, was that of H. R. Henderson & Company, and prayed recovery over against Henderson in the

event plaintiff recovered a judgment against them.

A pre-trial conference was had on September 29, 1954, and at that time defendants admitted that the amount sued for by plaintiff was correct and that Henderson received and used the merchandise, but defendants did not admit at that time that all of said merchandise was used in the performance of the contract in question.

On October 2, 1954, the defendant, H. R. Henderson & Company, filed a motion for continuance on the ground that it had previously filed an action against the present plaintiff, Magnolia Petroleum Company, in the District Court of Harrison County, Texas, involving the same controversy.

Plaintiff on October 8, 1954, filed its reply to Henderson's counterclaim, denying that it was guilty of negligence or breach of warranty, and in the alternative alleging that the said defendant was precluded from recovering on its counterclaim since it was guilty of contributory negligence in the use of the oil purchased from plaintiff.

In the meantime the parties had filed briefs in support of and in opposition to the motion for continuance, and on October 8, 1954, the Court entered an order overruling said motion.

On October 23, 1954, upon agreement of the parties the case was transferred from the El Dorado Division to the Fort Smith Division for trial, and on November 3 and 4, 1954, the case was tried to the Court, without a jury. At the conclusion of the trial the Court took the case under advisement, pending receipt from the respective attorneys of briefs and proposed findings of fact and conclusions of law.

After receiving the briefs and proposed findings from the respective parties, the Court concluded that a further hearing was necessary on the question of a reasonable attorney's fee to be allowed plaintiff's attorney, and on the question of whether the defendant surety companies were entitled to recover a judgment over against H. R. Henderson & Company for the amount of attorney's fee and penalty, if any, assessed against said surety companies. The supplemental hearing was had on December 28, 1954, at which time the defendant Henderson admitted the right of the defendant surety companies to recover judgment over against Henderson for the amount of the attorney's fee and penalty, if any, and ore tenus testimony was submitted on the question of a reasonable attorney's fee to be allowed plaintiff in the event the Court awarded plaintiff an attorney's fee.

And now the Court, having considered the pleadings, ore tenus testimony, stipulations, exhibits, briefs, proposed findings of fact and conclusions of law, and oral arguments of counsel for the respective parties, makes and files herein its findings of fact and conclusions of law, separately stated.

Findings of Fact.

1.

Plaintiff is a Texas corporation. The defendant, C. H. Leavell Company, is a Texas corporation; the defendant, Utah Construction Company, is a Utah corporation; the defendant, Aetna Casualty and Surety Company, is a Connecticut corporation; the defendant, Maryland Casualty Company, is a Maryland corporation; and the defendant, H. R. Henderson & Company, is a Texas corporation.

On September 24, 1952, the defendants, C. H. Leavell & Company and Utah Construction Company, acting as associated contractors and coadventurers under the trade name of Leavell-Utah, entered into a contract with the United States of America for the construction of certain smokeless powder magazines for the United States Naval Ammunition Depot at Shumaker, Arkansas, in the Western District of Arkansas, where said work was to be performed. Leavell-Utah, as principal, and The Aetna Casualty and Surety Company and Maryland Casualty Company, as sureties, on September 24, 1952, executed a standard Government form of payment bond to

the United States of America, wherein the said defendants bound themselves in the sum of $1,648,777.60, conditioned that if the principal should promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract and any and all duly authorized modifications of said contract, then the obligation to be void; otherwise that the bond remain in full force and effect.

The bond was accepted by the United States, and thereafter Leavell-Utah began work on the project. The defendant, H. R. Henderson & Company, hereinafter referred to as H. R. Henderson or Henderson, was a subcontractor of Leavell-Utah, and during the performance of the work under the subcontract purchased and received $20,575.63 worth of goods, wares and merchandise from the plaintiff. All of said goods were used in the performance of Henderson's subcontract, which in turn was a part of the prime contract between Leavell-Utah and the United States, and said goods were furnished and used with the knowledge, consent and approval of Leavell-Utah.

The defendant, H. R. Henderson, upon demand by plaintiff, refused to pay the $20,575.63, although it was more than ninety days past due. Plaintiff, within ninety days after supplying the last of the goods upon which the claim is based, notified the defendants, Leavell-Utah, The Aetna Casualty and Surety Company, and Maryland Casualty Company, of the failure of Henderson to pay the account, and of the nature and amount of said account.

One year had not elapsed since the date of the final settlement of the contract and no part of the said $20,575.63 has been paid to plaintiff.

All of the goods were purchased and used in the Western District of Arkansas.

### 2.

As heretofore stated, defendants in their separate answers admitted the accuracy of the account in question, but denied that all of the goods were used in the performance of the contract. However, two days before the trial defendants notified plaintiff that they conceded that all the goods were used in the performance of the contract and that it would not be necessary for plaintiff to have witnesses at the trial for the purpose of proving that fact. And, at the outset of the trial defendants stipulated and agreed that goods in the amount of $20,575.63 were purchased by Henderson and used in the performance of the contract.

### 3.

H. R. Henderson had been doing business with plaintiff since 1935. After Henderson obtained the subcontract with Leavell-Utah, J. P. McGee and Robert Plemons, employees of plaintiff, came to his office in Marshall, Texas. They reached an oral agreement for the purchase by Henderson and the sale by plaintiff of oil and other supplies to be used by Henderson in connection with the Shumaker project.

### 4.

The machines which defendants claim were damaged by plaintiff's oil are Euclids, commonly called "Ukes." They are similar to an ordinary trailer truck, except that they are much larger. Three of the Euclids were purchased by Henderson in Denver, Colorado, in 1950. The fourth one was purchased in 1952. All of the Euclids were used machines at the time Henderson purchased them. After purchasing the machines Henderson had 200 horsepower motors put in them in place of the 150 horsepower motors that were in them at the time they were purchased. The Euclids were equipped with sideboards making them capable of holding a load of 20 yards rather than the 13 yards they were originally built to hold and transport. The Euclids had been used on several jobs prior to the beginning of the job at Shumaker, Arkansas. Immediately prior to the Shumaker job they had been used on a project at Corpus Christi, Texas, and while on that job the Euclid motors had been overhauled.

The Euclids were brought to the Schumaker job early in December, 1952, and were first used on the job on December 13, 1952. The operation at that time was primarily a dirt moving project. The Euclids would be loaded with dirt and then driven a distance of one-fourth to three-fourths of a mile to the dumping pit, where the dirt was dumped. Henderson also had approximately 20 other pieces of equipment on the job, including bulldozers and caterpillars.

At first the Euclids were only used ten hours a day, but starting in the latter part of December, 1952, they were operated twenty hours a day, weather permitting, and this continued until April, 1953. During the day shift Henderson had a chief mechanic and a grease foreman, each of whom had assistants, to handle the maintenance of the equipment. A grease truck was used by the grease foreman, A. L. McBeth, and his assistants for the greasing and oiling of the equipment. One or more barrels of oil would be placed on the truck. The one to be used would be placed on its side. When McBeth wanted to add oil to a Euclid or other machine, or change the oil, he would have the Euclid stop in the field and would drive the grease truck up near the Euclid. He, or one of his assistants, would drain oil from the barrel into a five gallon bucket, and then the oil would be poured from the bucket into the crankcase of the Euclid. There was a complete oil change every 60 hours of operation of the Euclids and in the other equipment it was changed every 120 hours of operation. During the operation it was often necessary to add oil before the usual time for a complete change of oil. Ordinarily, no more than two Euclids would have the oil changed on the same day, and usually it was necessary to use more than one barrel of oil a day. A barrel of oil contains 55 gallons, and the normal capacity of a Euclid is about 12 gallons, including the oil in the filter, although McBeth testified that he put 15 or 16 gallons in the Euclids when he changed the oil. But, in view of the manner in which the Euclids and other equipment were oiled, regardless of whether the Euclids held 12 gallons or 16 gallons, it is clear that all four Euclids would seldom, if ever, be oiled out of the same barrel.

During the day shift the servicing of the Euclids was done by McBeth and his assistants. On the night shift, however, there were no mechanics or grease men on duty, and whatever servicing the equipment received was done by the operators. All, or practically all, of the men working for Henderson were hired through the Union, and some of them were far from satisfactory workers. Some of the Euclid drivers were inexperienced and knew very little about the machines they were operating. In fact, one of the drivers, J. E. Waldrop, had never driven a Euclid before and on his first day as a driver he drove one of the Euclids several hours with little or no water in the radiator.

It was apparent from the evidence that the primary concern of Henderson, and of the drivers, was to move as much dirt as possible in the shortest time, and little attention was given to the proper care and maintenance of the Euclids. The only maintenance record kept by anyone was a small notebook in which McBeth made certain entries, particularly the date of oil changes and amounts of oil that were added between oil change dates. This record had been inadvertently destroyed by McBeth. Two or three of the Euclids were turned over on the job, but were set upright and put back in operation with only a cursory check for possible damage to the motors. Sometimes the Euclids were operated at night without any headlights, and there were no dash lights to enable the operator to read the oil gauge or other instruments. A good portion of the time it was extremely dusty, and it is quite likely that at least some dust got in the oil as it was transferred from the barrel to the Euclids with the use of the five gal-

lon bucket. It is also quite likely that dust got into the five gallon bucket during the time it was not in use.

The oil pressure on two or three of the Euclids became very low, although on one of them the oil pressure was satisfactory and it was the oil gauge that was defective. One of the Euclids had gotten water into the crankcase as a result of a hole that had rusted through the sleeve wall, but it was repaired and put back in operation. One of the Euclids had a faulty oil filter which caused the oil to bypass the filter.

5.

On April 5, 6 and 7, 1953, the ground was wet and the Euclids were not operated. On April 8 they were operated two full shifts. Three of them were being operated on April 9, and at approximately 8:00 to 9:00 p. m. the motor on one of the Euclids "locked" or failed. On April 10, at about 6:00 to 7:00 p. m. one of the Euclids threw a rod through the block of the motor. On April 11, at about 2:30 p. m., a third Euclid locked or failed. Then the fourth Euclid was taken out of operation because it was not feasible to operate a single Euclid at a time. On April 13, one of the caterpillars failed.

These failures caused a considerable amount of concern to everyone. It was thought that sabotage might be involved, and the base commander and the Federal Bureau of Investigation were notified. Also, H. R. Henderson, General Manager of H. R. Henderson & Company, was notified, as were representatives of the plaintiff. Henderson ordered all the machines shut down until an investigation could be made. On Monday, April 13, J. A. Shores and J. P. McGee, employees of plaintiff, and J. H. Cox, Chief Mechanic of Henderson at Marshall, Texas, arrived in Camden to investigate the incidents.

On the morning of April 13, one sample of new oil from a barrel on the grease truck, and two samples of used oil which had been taken from two of the Euclids that had failed, were taken by Charles L. Taylor, Henderson's Euclid foreman, to the Lion Oil Company for analysis. These samples were examined and analyzed by Mr. Roy S. Wilson, Chief Chemist of the Refining Division of Lion Oil Company, and found to be normal in all respects.

On the same day, April 13, McGee took two samples of new oil, one from a drum that was still on the truck, and one from the drum that had been taken off the truck, and Shores took a sample of Diesel fuel. These three samples were taken by Shores and McGee to the Lion Oil Company for analysis and found to be normal. They advised Mr. Bert B. Aycock, Henderson's General Superintendent, that the oil was all right, and on the next day, April 14. the caterpillars and other equipment were put back into operation.

Also, on April 13, Cox, who as above stated was Henderson's chief mechanic at Marshall, Texas, was in Camden and examined the Euclids that had failed. He found that the bearings, rod journals, and other parts of the motors were "scored" or scratched. He testified that the scoring or scratches could have been caused by rust, dust, sand or other foreign substances. However, in his examination he found no rust but did see some rubber-like substance that had been taken from one of the filters.

On Tuesday, April 14, Shores and McGee collected seven additional samples of oil, one each from two of the Euclids and five of the caterpillars in which the oil had not been changed after the failures. These samples were sent to Mr. E. C. Daigle, Chief Chemist of plaintiff, were analyzed and were found to be normal. Also, on April 14, H. R. Henderson arrived in Camden and made some investigation of the matter. He looked in a barrel which Aycock pointed out to him as being the one that he (Aycock) thought had been used to oil the Euclids, and found a small amount of rust. The evidence

is insufficient to show that the barrel that Henderson examined had been used to oil the Euclids in question or when the contents had been used or in which machines.

On Wednesday, April 15, L. B. Williams, one of Henderson's employees, arrived in Camden. At that time one barrel of oil was on the dock and one barrel was in front of the grease house. Mr. Ray S. Johnson, Henderson's Master Mechanic on the job, cut the top out of these two barrels with the use of a hammer and chisel. Johnson saw no rust in either of the barrels, but Williams thought he saw rust in one of them. Williams took a sample of oil from one of the barrels. It was not clear from the evidence when the oil had been used out of these barrels, whether any of the oil had been used in the Euclids, or how long the barrels had been out in the open. This sample, together with several other samples, was taken by Cox back to Marshall and given to H. R. Henderson.

On the same day, April 15, the Euclid engines were in the process of being reassembled. William Tooley, Service Manager of Cummins, and Ray Johnson were doing the work and were being watched by Sidney White, an employee of Cummins, and others who were interested in the failures. Tooley was not a witness at the trial, but Johnson and White were both witnesses and neither of them saw any rust in the oil or on any of the parts of the Euclids. However, they did find particles of rubber or a rubber-like substance in the filters of one or two of the Euclids. Apparently some or all of these particles were pieces of neoprene from the inside of the flexible hose or lines.

At that time no one pretended to know the cause of the failures, and no one contended that the failures were caused by rust in the oil. Henderson continued to buy and use the same brand of oil and the products of the plaintiff until September, 1954, shortly after the suit was filed.

**6.**

After H. R. Henderson returned to Marshall, Texas, he received the samples of oil that had been brought to Marshall by Cox. After a great deal of study and thought, Henderson finally concluded that rust in the oil must have caused the failures of the Euclids. He did not remember when he reached this conclusion, but it was sometime prior to May 25, 1953. In the meantime Henderson had given all the oil samples except one to Mr. Marnan, an employee of plaintiff, and had written plaintiff blaming it for the failures. On May 25, 1953, Shores, McGee and Plemons, employees of plaintiff, went to Henderson's office at Marshall and discussed the matter with him. They could not agree as to the cause of the failures, and at that time Henderson turned over to plaintiff's representatives the one remaining oil sample that had been taken by Williams from the almost-empty barrel.

This sample was examined by Daigle, plaintiff's chief chemist, and found to contain 99.07% oil, 0.80% water, and 0.13% sediment. A microscopic examination indicated that the sediment was principally iron rust with some sand and a small amount of cellulose-like fibers. There was no testimony as to whether the oil contained a sufficient amount of foreign substance, and particularly rust, to harm a Euclid engine.

On July 17, 1953, Henderson requested a report on this sample, and plaintiff sent him the report on July 21, 1953.

**7.**

The Euclids were all repaired and put back in operation on April 20, 1953. The cost of the parts used in repairing the Euclids was $7,666.12.

Approximately ten days or two weeks after the Euclids were put back in operation one of the Euclids threw a rod through the block. Henderson admits that this failure was caused by a faulty rod and not by plaintiff's oil. Henderson also admits that the failure of

the caterpillar on April 13 was not caused by plaintiff's oil.

### 8.

The oil furnished by plaintiff was of good quality and fit for the use for which it was intended. The Euclids were not damaged by plaintiff's oil.

### 9.

The defendants, The Aetna Casualty and Surety Company and Maryland Casualty Company, refused to pay plaintiff's claim for the goods furnished the defendant, H. R. Henderson & Company.

### 10.

Mr. John M. Lofton, Jr., a member of the law firm of Owens, Ehrman & McHaney, was the attorney who had the primary responsibility in representing plaintiff in this action. The matter first came to the attention of Mr. Lofton on August 5, 1954.

With regard to plaintiff's claim against defendants, and disregarding the counterclaim, plaintiff's attorney, inter alia, performed the following legal services:

He first made a preliminary examination of the law pertaining to plaintiff's claim under the Miller Act. Then, after conferring with plaintiff's employees and obtaining the necessary information, he, or a member of his firm, prepared and filed a complaint against the defendants, and after some difficulty obtained service of summons upon said defendants. In due time defendants answered, admitting the substantial accuracy of the amount of merchandise purchased by Henderson from plaintiff, but denying that all of said merchandise was used in connection with the contract referred to in plaintiff's complaint.

A pre-trial conference was had on September 29, 1954. At that time the issues in the case were discussed and a pre-trial order was entered which, inter alia, provided, " * * * counsel for defendants admit in open court that the amount sued for in the complaint herein is correct and that the merchandise as alleged therein was sold and delivered by the use plaintiff to the defendant H. R. Henderson & Company and by it used, but it is not agreed by said counsel that all of such merchandise was used by the said defendant H. R. Henderson & Company in the performance of the contract involved herein."

At the time the instant suit was filed there was an action pending in the District Court of Harrison County, Texas, wherein H. R. Henderson & Company as plaintiff sought judgment against Magnolia Petroleum Company as defendant upon the same subject matter that is involved in the counterclaim in the instant suit. The Texas complaint or petition was filed on August 14, 1954, and in said Texas complaint Henderson, after alleging the damage claimed to have been caused by Magnolia's oil further alleged, " * * * and that thereafter this plaintiff refused to pay the unpaid balance on its bill which accrued on said job, in the sum of $20,538.78 and this plaintiff is willing for this bill to be deducted from the amounts due the plaintiff for the damages which are set out herein."

On October 2, 1954, Henderson filed a motion for continuance of this action on the ground of the pendency of the action in the Texas Court. In connection with this motion plaintiff's attorney, or a member of his firm, prepared and filed a brief in opposition to said motion, and in due time the motion was overruled by the Court.

After the pre-trial conference on September 29, 1954, Mr. Lofton conferred with Mr. Alston Jennings, one of defendants' attorneys, and was informed by Mr. Jennings that in all probability they would be able to agree that all the products furnished by Magnolia were used in the performance of the contract and that the only issue for trial would be that raised by the counterclaim. However, Mr. Jennings at that time could not give absolute assurance that such an agreement would be made, and Mr. Lofton proceeded to

interview plaintiff's accountants and other witnesses in order to be in a position, if necessary, to prove the correctness of the account and that all of the products were used in the performance of the contract.

Two days prior to the trial of this case plaintiff was notified that defendants would agree that all of the products were used in the performance of the contract, and that the only remaining issue was that presented by the counterclaim. After receiving this notice, plaintiff's attorney was relieved of the necessity of performing further services in connection with plaintiff's claim against defendants, and the remainder of his services were in connection with the defense against the counterclaim.

The defendant, H. R. Henderson & Company, filed its answer and counterclaim on September 23, 1954, and on the same date the other defendants filed their joint answer. In Henderson's counterclaim, it alleged that it had been damaged in the sum of $30,500 because of the alleged contaminated oil sold by the use plaintiff and alleged that the amount due the use plaintiff should be deducted from said sum of $30,500 and that it should have judgment for the remainder. The other defendants adopted the allegations of the defendant Henderson in reference to the counterclaim.

The complaint of the plaintiff and the answers of the defendants disclose that there was very little, if any, dispute between the use plaintiff and the defendant Henderson as to the amount of the indebtedness due the use plaintiff but, upon the filing of the counterclaim, the plaintiff's attorney, Mr. Lofton, at once began preparing to present the defense of the use plaintiff and, in that connection, the testimony discloses that he did a great deal of work. He was unable to say how much time was actually consumed in the preparation for trial on the counterclaim, but he did interview all witnesses and directed the investigation to ascertain the facts. He conferred with expert operators of diesel engines and was thoroughly prepared to and did present the defense of the use plaintiff against the counterclaim, and the trial consumed two days time. It is quite clear that the majority of the work done by the attorney for the use plaintiff was done in connection with the defense against the counterclaim.

Discussion

The defendants admit that H. R. Henderson & Company is indebted to the plaintiff in the sum of $20,575.63, for goods purchased by Henderson from plaintiff and used in the performance of the contract between Leavell-Utah and the United States of America. Thus, the principal question remaining is whether Henderson's counterclaim against plaintiff is well founded.

The burden of proof is upon the defendant, Henderson, to establish by a preponderance of the evidence that the plaintiff was guilty of negligence or breach of warranty. Kisor v. Tulsa Rendering Co., D.C.Ark., 113 F.Supp. 10, 16; Hydrotex Industries v. Sharp, 212 Ark. 886, 208 S.W.2d 183; Western Coal & Mining Co. v. Hollenbeck, 72 Ark. 44, 80 S.W. 145; Vol. 8, Cyclopedia of Federal Procedure, 3d Ed., Sec. 26.295. See also, Franke's, Inc., v. Bennett, 201 Ark. 649, 146 S.W.2d 163.

The oral sales agreement in the instant case was made in Texas, but was to be performed in Arkansas, and the Arkansas law governs the nature, obligation and effect of the agreement. Lewis v. Jackson & Squire, Inc., D.C. Ark., 86 F.Supp. 354, 360; Great Atlantic & Pacific Tea Co. v. Smith, D.C. Ark., 75 F.Supp. 156, affirmed 8 Cir., 170 F.2d 474; Crown Central Petroleum Corp. v. Speer, 206 Ark. 216, 174 S.W.2d 547; Leflar, Conflict of Laws, 3 Ark.Law Review 18, 27. As a matter of fact, it matters little whether the Arkansas law or the Texas law governs, since the law applicable to the issues herein is apparently the same

in both States. See, Hydrotex Industries v. Floyd, 209 Ark. 781, 192 S.W. 2d 759.

██ In their brief defendants apparently abandoned the theory that plaintiff was guilty of negligence in manufacturing or furnishing defective oil, and suffice it to say that there was absolutely no evidence of negligence on the part of plaintiff. The only possible contention that could be made in this regard is that the presence of rust in an oil drum would bring into play the doctrine of res ipsa loquitur. However, that doctrine is confined in its application to instances in which the article causing the injury was in the exclusive possession and control of the defendant up to the time of the injury or damage suffered by the plaintiff. Coca-Cola Bottling Company of Fort Smith v. Hicks, 215 Ark. 803, 223 S.W.2d 762; Arkansas Power & Light Co. v. Butterworth, Ark., 258 S.W.2d 36. In the instant case the only testimony concerning rust in any of the oil drums was that relating to rust in a drum that had been almost completely emptied and had been lying on the ground for an indeterminate period of time. Since plaintiff (defendant as to the counterclaim) did not have exclusive possession and control of the oil drum up to the time the Euclids failed or to the time the rust was found in the oil drum, the doctrine of res ipsa loquitur could not be applied herein.

██ Defendants' primary contention is that Henderson's Euclids were damaged by reason of a breach of an implied warranty on the part of plaintiff in furnishing oil that was unfit for the use for which it was intended. It is true, as defendants contend, that under the Arkansas law "in dealings concerning a product such as paint, there exists an implied warranty that the product is reasonably fit for use for the purpose for which it is deliberately sold." Hydrotex Industries v. Sharp, 212 Ark. 886, 208 S.W.2d 183, 184; Hydrotex Industries v. Floyd, supra. The same rule would apply to the sale of oil in a drum, and thus there was an implied warranty in the instant case that the oil furnished by plaintiff was reasonably fit for use in the Euclids, since that was the use for which the oil was intended. But, as above stated, the burden of proof is upon defendants to establish a breach of warranty on the part of plaintiff, and defendants have failed to meet that burden.

The only substantial testimony tending in any wise to establish that the oil was defective was the testimony concerning rust in one of the oil drums, together with the chemical analysis of a sample purportedly taken from said drum. To accept defendants' contention of the Euclid failures being caused by rust in plaintiff's oil, the Court would have to *assume* that the oil drum containing the small amount of rust was the one that had been used to oil the Euclids that failed, *assume* that there was sufficient rust in the oil to cause the failures, and *assume* that the failures were actually caused by rust in the oil and not by other causes. In other words, as stated in finding of fact No. 5, it was not clear from the evidence when the oil had been used out of the oil drum, whether any of the oil had been used in the Euclids, or how long the drum had been out in the open, and it would be mere speculation and conjecture to conclude that oil from the rusty drum had been used in the Euclids that failed. There was no evidence as to the length of time it would take for rust to form in an oil drum, and it is quite likely that the small amount of rust found in the oil drum had formed since the drum had been thrown off the grease truck. Moreover, there was no evidence that 0.13% of sediment, mostly rust (which was the chemical analysis of the oil sample apparently taken from the drum), is a sufficient amount of foreign substance to harm an engine or cause a Euclid failure. Nor is there any way in which the Court can determine how much, if any, of this sediment was a

result of Johnson's cutting out the top of the drum with a hammer and chisel, and how much, if any, was in the oil before the top was cut out. A finding by the Court that the oil contained a sufficient amount of rust to harm an engine would necessarily be based upon speculation and conjecture.

On the other hand, the evidence clearly established that the Euclids did not receive proper care and maintenance, particularly during the night shift; that several of them had low oil pressure prior to the failures; that one of them had a faulty oil filter; that two or three of them had been turned over on the job; that some of the drivers were inexperienced; that the Euclids were oiled in a manner which did not protect the oil from dust; that one of the Euclids had gotten water in the crankcase; and that other difficulties had been experienced with the Euclids.

■■ As above stated, a finding by the Court that the Euclid failures were caused by rust in the oil would necessarily be based upon speculation and conjecture, and the Court is not at liberty to reach a judgment in that manner. Jonesboro Coca-Cola Bottling Company v. Hambrooke, 206 Ark. 385, 175 S.W.2d 387; Jonesboro Coca-Cola Bottling Company v. Young, 198 Ark. 1032, 132 S.W.2d 382; Franke's, Inc., v. Bennett, 201 Ark. 649, 146 S.W.2d 163. The Court is convinced that the Euclid failures were not caused by rust in the oil, but were caused by a combination of factors relating to the misuse of the Euclids and their improper care and maintenance. It follows that Henderson's counterclaim is without merit and should be dismissed.

The remaining question is whether the defendants, The Aetna Casualty and Surety Company, and Maryland Casualty Company, are liable to plaintiff for an attorney's fee and the statutory penalty of twelve per cent.

Plaintiff contends that a penalty and attorney's fee should be assessed against the sureties under the provisions of Sec. 66–514, Ark.Stats.1947, Annotated 1953 Supp. Defendants contend that the statute contemplates "insurance" contracts and does not apply to suits against a surety upon a bond, and further, that the bond involved herein was executed under a statute of the United States and should not subject the sureties to penalties and attorney's fees provided by the State statute.

■ Defendants rely upon the cases of Continental Casualty Co. v. Schaefer, 9 Cir., 173 F.2d 5, and Liebman v. United States, for Use and Benefit of California Electric Supply Co., 9 Cir., 153 F.2d 350, as sustaining their contention that the Arkansas law is inapplicable. These cases do support the rule that Federal law governs the *construction* of Federal statutes, but in the instant case the construction of the Miller Act is not involved. The Act is silent upon the question of allowance of interest, costs, attorney's fees and penalties, and the authorities seem to be uniform in holding that in suits under the Miller Act the recovery of interest, costs and attorney's fees is governed by the state law. Illinois Surety Company v. John Davis Company, 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206; Aetna Casualty & Surety Co. v. B. B. B. Const. Corporation, 2 Cir., 173 F.2d 307; United States, for Use and Benefit of Lichter v. Henke Const. Co., 8 Cir., 157 F.2d 13, 24; Continental Casualty Co. v. Clarence L. Boyd Co., 10 Cir., 140 F.2d 115; United States for Use and Benefit of Brady's Floor Covering, Inc., v. Breeden D.C.Alaska, 110 F.Supp. 713 (holding that attorney's fee and interest were recoverable under the statutes of Alaska); United States to Use of Watsabaugh & Co., v. Seaboard Surety Co., D.C.Mont., 26 F.Supp. 681, 693, affirmed 9 Cir., 106 F.2d 355 (holding that no attorney's fee was recoverable under the Montana law).

■ It seems that the rule governing the allowance of interest, costs and attorney's fees would apply with equal

validity to the allowance of statutory penalties, and that such allowance is to be determined by the state law.

Under the statutes of some states a penalty and attorney's fee may be recovered against a surety company, while in other states such recovery is denied. See, 126 A.L.R. 1439, 1451–1453. The applicable Arkansas Statute is Sec. 66–514, supra, which provides:

"In all cases where loss occurs and the cargo, fire, marine, casualty, fidelity, surety, cyclone, tornado, life, health, accident, medical, hospital, or surgical benefit insurance company liable therefor shall fail to pay the same within the time specified in the policy, after demand made therefor, such company shall be liable to pay the holder of such policy, in addition to the amount of such loss, twelve (12) per cent damages upon the amount of such loss together with all reasonable attorney's fees for the prosecution and collection of said loss. This liability attaches when liability is denied by the insurer and suit is filed. The attorney's fee shall be taxed by the court where the same is filed on original action, by appeal or otherwise, and to be taxed up as a part of the costs therein and collected as other costs are, or may be by law collected; * * *."

■ The purpose of the statute is to reimburse the plaintiff for expenses incurred in enforcing the contract. Sun Life Assurance Company of Canada v. Coker, 187 Ark. 602, 61 S.W.2d 447; American Liberty Mutual Ins. Co. v. Washington, 183 Ark. 497, 36 S.W.2d 963. The good faith of the defendant in denying liability is not a valid defense. Life & Casualty Ins. Co. of Tennessee v. Wiggins, Ark., 273 S.W.2d 405.

■ The statute is highly penal and should be strictly construed.

Broadaway v. Home Ins. Co., 203 Ark. 126, 155 S.W.2d 889; Taylor v. Mutual Life Ins. Co. of New York., 193 Ark. 251, 98 S.W.2d 944; National Old Line Ins. Co. v. Russell, 188 Ark. 632, 67 S.W.2d 195. It must be construed in connection with Sec. 66–201, Ark.Stats.1947, Annotated. Coal Operators Casualty Co. v. F. S. Neely Co., 219 Ark. 579, 243 S.W.2d 744; Liverpool & London & Globe Ins. Co. Ltd., v. Jones, 207 Ark. 237, 180 S.W.2d 519.

Sec. 66–201, Ark.Stats., supra, provides, inter alia:

"Corporations may be formed or enter this State to effect insurances for the following purposes: * * *

"7. Fidelity and Surety Insurance.—Against loss from the default of persons in positions of trust, public or private, and to guarantee the performance of contracts and obligations other than that of insurance. * * *"

■ Since Sec. 66–514, Ark.Stats., supra, specifically includes surety companies, and the definition of surety insurance contained in Sec. 66–201, supra, clearly includes the type of bond involved herein, there seems to be no escape from the conclusion that plaintiff is entitled to recover the 12% penalty and attorney's fee from the defendant surety companies.

■ It is true that 66–514 provides that the company "shall be liable to pay the holder of such policy," and technically plaintiff was not a holder of a policy issued by the defendant surety companies. But, under the Arkansas decisions a holder within the meaning of the statute " 'is the person, or persons, who, having the right to sue, have exercised that right successfully.' " Traders & General Ins. Co. v. Powell, 8 Cir., 177 F.2d 660, 668; Huddleston v. Home Life Insurance Company of New York, 182 Ark. 1036, 34 S.W.2d 221. And, the plaintiff herein had the right to sue the

defendant surety companies, has exercised that right successfully, and is thus entitled to recover the penalty and attorney's fee.

The liability for a penalty and attorney's fee is the primary liability of the surety companies, but H. R. Henderson & Company admits that said surety companies are entitled to recover a judgment over against it for the amount of the penalty and attorney's fee.

Plaintiff contends that the attorney's fee should be based upon all the work performed in the case, including the work in defense of the counterclaim. Contrarily, defendants contend that the attorney's fee, if any, should be based solely on the work performed with reference to plaintiff's claim on the account and without regard to the work done in defending against the counterclaim.

█ The Court is of the opinion that defendants' contentions in this regard are well founded. The counterclaim was entirely separate from plaintiff's claim against Henderson on the account, and even if the surety companies had originally admitted liability it nevertheless would have been necessary for plaintiff to defend against Henderson's claim. The only difference is that the defense of Magnolia would have been presented in the Texas Court (the Court of Henderson's choice) instead of in this Court (the Court of Magnolia's choice). Stated differently, an attorney's fee, which is allowed because of the failure of the surety companies to admit liability, should not be based on legal services which would have been required even though the surety companies had admitted liability.

█ If plaintiff were entitled to an attorney's fee based on all the services performed, a fee of $5,000 would have been reasonable. But, since the Court has concluded that the fee should be based solely on the work performed in connection with plaintiff's claim on the account, the Court feels that an attorney's fee of $1,000 is reasonable in this action.

The statutory penalty is 12%, which in the instant case amounts to $2,469.-08.

In accordance with the foregoing discussion, plaintiff is entitled to recover a joint and several judgment against all of the defendants in the sum of $20,575.63, with interest at the rate of 6% per annum from the date of the judgment herein until paid. Plaintiff is also entitled to recover a joint and several judgment against the defendant surety companies in the sum of $3,469.08, being the statutory penalty of $2,469.08 together with the attorney's fee of $1,000.

█ The defendant, H. R. Henderson & Company is primarily liable for the sum of $20,575.63, and the defendant surety companies are primarily liable for the $3,469.08 representing the penalty and attorney's fee. All the defendants (other than Henderson) are entitled to recover on their cross-claim against Henderson a judgment over against the said Henderson in the sum of $20,575.63. And in view of Henderson's admission of liability at the supplemental hearing, the defendant surety companies are likewise entitled to recover a judgment over against Henderson in the sum of $3,469.08, being the amount of the attorney's fee and penalty.

Under the State procedure the parties secondarily liable ordinarily would have to pay some or all of the judgment before they could ask for judgment over against the party primarily liable, but under Rule 13(g), Fed. Rules Civ.Proc. 28 U.S.C.A., a party may cross-claim against a co-party who "may be liable" to him for all or part of the claim asserted against the cross-claimant. This rule permits a party in some instances to accelerate his right to assert a claim against a co-party. See, 3 Moore's Federal Practice, 2d Ed., Secs. 13.34, 14.08.

■ Of course, the judgment in favor of the surety companies and Leavell-Utah against Henderson is unenforcible unless and until said defendants are required to pay a part or all of plaintiff's judgment herein. Therefore, execution or process for the collection of the said defendants' judgment against Henderson will be ordered stayed until such time as the said defendants shall have been required to satisfy a part or all of the plaintiff's judgment herein, and then execution or process shall issue only in the amount that has been paid by said defendants. See, Thomas v. Malco Refineries, Inc., 10 Cir., 214 F.2d 884; Burris v. American Chicle Co., 2 Cir., 120 F.2d 218, 223. Compare, United Gas Corp. v. Guillory, 5 Cir., 206 F.2d 49; Concordia College Corp. v. Great American Ins. Co., D.C. Minn., 14 F.R.D. 403; Jeub v. B/G Foods, Inc., D.C.Minn., 2 F.R.D. 238.

### Conclusions of Law

**1.**

The Court has jurisdiction of the parties to and the subject matter of this action.

**2.**

The defendant, H. R. Henderson & Company, is indebted to the plaintiff, Magnolia Petroleum Company, in the sum of $20,575.63, for goods purchased by Henderson from plaintiff and used in the performance of the contract involved herein.

**3.**

The plaintiff was not guilty of negligence or breach of warranty in the furnishing of oil and other products to the defendant, H. R. Henderson & Company, and the counterclaim of the said defendant Henderson should be dismissed.

**4.**

The plaintiff is entitled to recover a penalty of and from the defendants, The Aetna Casualty and Surety Company and Maryland Casualty Company, in the sum of $2,469.08.

**5.**

The plaintiff is entitled to recover a reasonable attorney's fee of and from the said defendant surety companies in the sum of $1,000.

**6.**

The plaintiff is entitled to recover a joint and several judgment against all of the defendants in the sum of $20,575.-63, with interest at the rate of 6% per annum from the date of the judgment herein until paid.

**7.**

The defendants, C. H. Leavell & Company, Utah Construction Company, The Aetna Casualty and Surety Company, and Maryland Casualty Company, are entitled to recover a judgment over against H. R. Henderson & Company in the sum of $20,-575.63.

**8.**

The defendants, the Aetna Casualty and Surety Company and Maryland Casualty Company, are entitled to recover a judgment over against H. R. Henderson & Company in the sum of $3,469.08, being the amount of the penalty and attorney's fee.

**9.**

Execution or process for the collection of the judgment obtained by the remaining defendants against H. R. Henderson & Company should be stayed until such time as the said defendants shall have been required to satisfy a part or all of the plaintiff's judgment herein, and then execution or process should issue only in the amount that has been paid by said defendants.

A judgment in accordance with the above should be entered.