**ALBERS MILLING COMPANY, a corporation, Plaintiff,**

v.

**J. P. DONALDSON, and Gwen Donaldson, Defendants.**

**Civ. A. No. 413.**

United States District Court
W. D. Arkansas,
Harrison Division.

Nov. 27, 1957.

684

Hardin, Barton, Hardin & Garner, Ft. Smith, Ark., for plaintiff.

J. E. Simpson, Ted P. Coxsey, Berryville, Ark., for defendants.

———◇———

JOHN E. MILLER, District Judge.

This is an action by the plaintiff, Albers Milling Company, to recover the sum of $8,761.10 allegedly due it by defendants for poultry feed purchased by defendants at various times from April 17, 1956, through January 31, 1957.

In their answer defendants deny being indebted to plaintiff, and by way of counterclaim allege that they are entitled to recover the sum of $6,868.56 from plaintiff. Defendants' counterclaim is based upon two contentions: .

First, defendants allege that one of the flocks of turkeys involved in this action was, in fact, owned by the plaintiff, and the plaintiff was obligated to pay for the turkey poults, feed, and medication, and in addition to pay 20 cents per poult to defendants for furnishing the brooder house, feeders, waterers, and labor necessary to brood the poults ready for range. Defendants allege that the plaintiff did not comply with its agreement.

Second, defendants allege that the plaintiff financed a second flock of turkeys and furnished defendants moldy feed, which caused the turkeys to be sick and inferior and prevented plaintiff from making a profit on the sale of said turkeys.

The plaintiff filed a reply to defendants' counterclaim denying the allegations contained therein, and upon the issues as made by the pleadings the case was tried to the Court without a jury on September 12, 1957. At the conclusion of the trial the Court took the case under advisement pending receipt of briefs from the parties in support of their respective contentions. The briefs have been received and the Court, having considered the pleadings, evidence, and briefs of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

Findings of Fact

1.

The plaintiff is a Delaware corporation authorized to do, and doing, business in the State of Arkansas. The defendants are husband and wife, and are citizens and residents of Green Forest, Carroll County, Arkansas. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

2.

Prior to 1956 the defendant, J. P. Donaldson, had been engaged in the poultry business and more particularly in the raising of turkeys. In early January, 1956, Donaldson was contacted by Everett Farney, a field representative and salesman for plaintiff, and by Clyde Johnson, an authorized feed dealer of plaintiff in Green Forest, Arkansas. As a result of this meeting, Donaldson and his wife, Gwen Donaldson, on January 12, 1956, executed an "Application for Turkey Financing to Albers Milling Company". This application contained detailed information about Donaldson, including a financial statement. The application indicated that Donaldson contemplated purchasing 8,000 "large

whites" on March 15, 1956, and 8,000 "B. B. bronze" on May 12, 1956. Among other things the application provided:

"It Is Understood That:

\*　　\*　　\*　　\*　　\*　　\*

"As security for his account the grower will give Albers Milling Company a First Lien Chattel Mortgage covering all turkeys owned.

\*　　\*　　\*　　\*　　\*　　\*

"All monies received from sale of turkeys will be paid to Albers Milling Company immediately until account is paid in full. Checks received from sale of turkeys to be made out jointly by buyer to Albers Milling Company and grower.

\*　　\*　　\*　　\*　　\*　　\*

"The relationship between applicant and Albers Milling Company shall be that of debtor and creditor. Applicant to have the sole responsibility for the raising and sale of birds. Albers Milling Company not to have any interest in profits of applicant and is not to share any losses sustained.

\*　　\*　　\*　　\*　　\*　　\*

"This application when accepted by Albers Milling Company and Chattel Mortgage executed by applicant, shall constitute the entire agreement of the parties hereto, and no agent of either party hereto has authority to alter or change the terms hereof and neither party is or shall be bound by any statement or representation not in conformity herewith.

\*　　\*　　\*　　\*　　\*　　\*

"This financial information and application for Turkey Feed Financing is given for the purpose of obtaining merchandise from Albers Milling Company on credit, it being intended that the seller shall be entitled to rely on said financial statement in extending credit to the buyer."

On February 13, 1956, Robert A. Nichols, plaintiff's credit manager, wrote defendants as follows:

"Dear Mr. & Mrs. Donaldson:

"We are very happy to advise that we have today approved your application for turkey financing for the 1956 season.

"Our acceptance is based on the putting in of 8,000 Broad Whites to be sold as broilers at 14 to 16 weeks. A second group of 8,000 Bronze will be grown to maturity. We would appreciate from you for our files a written confirmation from the processor stipulating that he will take the Broad Whites by the 14th to 16th weeks.

"In the event you are unable to get a guaranteed market for the early Whites, it is our understanding that you propose to feed one flock of 10,000 Bronze instead.

"We appreciate the opportunity of working with you in '56 and sincerely trust that this season will be very successful for you."

On March 30, 1956, defendants executed a chattel mortgage to plaintiff upon "7,000 Thompson Broad White turkeys" which had been hatched on the previous day. The chattel mortgage covered the 7,000 white turkeys and "all future replacements, increase, products, and proceeds thereof". The mortgage further provides that it is security for any and all future advances made by the mortgagee to the mortgagor before June 30, 1957.

### 3.

The above-mentioned 7,000 white poults were purchased by Donaldson from the Shelter Ridge Turkey Hatchery when the poults were one day old. Donaldson brooded the white turkeys until they were ready for the range, and at that time Donaldson requested Farney to remove the turkeys from the brooder house. It was Donaldson's understanding, based on conversations with Farney, that plaintiff was obligated to dispose of the turkeys and that he (Donaldson) was to receive 20 cents per head for brooding the turkeys. Farney attempted to find a buyer for the turkeys, but it is not

clear from the evidence whether he was doing this as a result of an oral agreement between Donaldson and him or whether he was merely doing it as an accommodation to Donaldson.

In any event, a buyer was not found for the white turkeys at that time, and subsequently the white turkeys were sold on September 10 and September 12, 1956, for the total sum of $19,715.40. This money was paid to plaintiff and credited on defendants' account.

4.

On June 15, 1956, Donaldson purchased 8,000 bronze poults. In raising these bronze turkeys Donaldson encountered considerable difficulty with disease at various stages of growth of the turkeys. He sent some of the turkeys to a veterinarian in Springfield, Missouri, for posting (autopsy) and diagnosis. On July 12, 1956, the veterinarian was of the opinion that the turkeys had mycosis and enteritis. On August 10 he was of the opinion that some mold infection was still present. On September 2, 1956, he found no mold infection in the turkeys but was of the opinion that they were not uniform in size and that some were stunted. Enteritis can be a primary disease and the cause of enteritis is not known. Mycosis is a type of disease which can be caused by mold, stagnant water, litter, etc. The most common cause of mycosis is litter around the water troughs. The type of mold found by the veterinarian was the type that grows on the ground, in water, or the air. The mold may be present in the turkeys' feed.

During the time Donaldson was raising the bronze turkeys some of the feed purchased by Donaldson from plaintiff's dealer, Clyde Johnson, was found to be caked and appeared to be moldy. It was not clear from the evidence how much of the feed was affected in that manner. The fact that feed is caked does not mean that mold is present.

There was evidence that some of the feed handled by Johnson was stored on a moist concrete floor, and it is possible that the moisture caused some mold.

In addition to purchasing feed from plaintiff, Donaldson also purchased some items such as rice, corn and oats from others.

5.

The bronze turkeys were sold in November and December of 1956. The dates and sale prices were as follows: November 20–23, 1956, $13,440.70; December 11, 1956, $14,787; December 26, 1956, $7,605.79. These amounts were paid to plaintiff and credited on defendants' account.

These bronze turkeys had been purchased on June 15, 1956, and thus the turkeys sold on November 20–23, 1956, were approximately 23 weeks old at the time they were sold; the turkeys sold on December 11, 1956, were approximately 25½ weeks old at the time they were sold; and the turkeys sold on December 26, 1956, were approximately 27 weeks old at the time they were sold.

The average weight of the hens at the time of sale was 16.25 pounds, and the average weight of the toms at the time of sale was 23.74 pounds.

The normal average weight of hens at 22 weeks is 14 to 15 pounds, and the normal average weight of toms at 22 weeks is 24 to 26 pounds. The evidence does not disclose the weight of the bronze turkeys at the age of 22 weeks, since the only weight figures given were those of the turkeys at the time of sale. Nor does the evidence disclose what the normal average weight of either hens or toms would be at the age of 23, 25½, or 27 weeks.

6.

The defendants made no profit on the sale of the bronze turkeys. Under good conditions a grower may make as much as a dollar each in raising and selling turkeys of this type.

The cost of medication for all the turkeys, white and bronze, was $3,633.66,

which is substantially more than is ordinarily incurred. However, there was no evidence as to what the ordinary expense of medication is.

### 7.

Everett Farney, plaintiff's sales representative, died in September of 1956. There was very little evidence to indicate the extent of Farney's authority.

The "Application for Turkey Financing" executed by defendants was witnessed by Farney as a "salesman". The application was not effective until accepted by Albers Milling Company, and the application specifically provided that "no agent of either party hereto has authority to alter or change the terms hereof and neither party is or shall be bound by any statement or representation not in conformity herewith".

Aside from this statement in the "Application for Turkey Financing", the only direct evidence of Farney's authority was the testimony of Robert A. Nichols, plaintiff's credit manager, that Farney had no authority to enter into any oral agreements on behalf of the plaintiff.

In addition to signing the "Application for Turkey Financing" as a witness, Farney also signed the chattel mortgage which was executed by defendants.

There was no evidence that plaintiff held Farney out to be its agent or clothed him with any apparent authority to act as agent on its behalf.

### 8.

The amount due by defendants to plaintiff is $8,761.10. Defendants do not question the accuracy of this amount, and in fact on December 31, 1956, Donaldson wrote Jack Bratten, plaintiff's branch manager in Kansas City, Missouri, as follows:

"Dear Jack:

"I've talked to Mr. Anderson several times since I saw you in Kansas City. He says that I owe Albers and that it must be paid. I have been unable to borrow enough money on my properties because of the existing mortgages. The quick, painless solution seems to be that Albers purchase the building at a fair price on the present market. This will clear the indebtedness.

"Most of the major companies in this area have a policy of giving the grower a second chance. They take one half of the profit the following year, and the balance the next year.

"Since you cannot determine the course of action the West Coast office will choose, I am proceeding on the assumption they will not want my account next year. Nevertheless, Jack, I will be glad to give you a second mortgage against *all* my profit on the '57 turkeys, or '58, if necessary. As the company did not require Real Estate security at the start of the season, I see no reason why I should saddle my already debt ridden property with a second mortgage. You can check with Mr. Ray Anderson, President of First National Bank, Green Forest, Ark., and he will give you a complete breakdown on my financial status etc.

"Will be expecting to hear from you soon."

### 9.

Clyde Johnson was an authorized dealer of Albers feed in Green Forest, Arkansas. The feed would be placed by plaintiff in Johnson's store on a consignment basis. Plaintiff exercised no control over Johnson with respect to the buildings he used, etc. Johnson set his own sale price on feed.

While Johnson was in business all the Albers feed used by Donaldson was purchased from Johnson's store. Johnson went out of business in September 1956, and thereafter Donaldson purchased Albers feed directly from the plaintiff.

### Discussion

Defendants admit the correctness of the account in the sum of $8,761.10, and thus the remaining question is whether

defendants are entitled to recover on their counterclaim.

With regard to the counterclaim defendants contend that they entered into an agreement with plaintiff's field representative, Farney, in which it was agreed that defendants were to furnish the brooder house, feeders, waterers, and labor necessary to brood 7,000 white turkeys; plaintiff was to pay for the poults, feed, and medication and to pay defendants 20 cents per poult for furnishing the equipment and labor necessary to brood the poults until they were ready for range, at which time plaintiff was obligated to take possession of the turkeys or otherwise dispose of them. Defendants contend that plaintiff did not comply with this agreement and that they are entitled to recover damages on their counterclaim.

Defendants further contend that as to the bronze turkeys the plaintiff furnished moldy feed which caused the turkeys to become sick and ultimately resulted in inferior and stunted turkeys and loss of profits by defendants.

Plaintiff, on the other hand, contends that parol evidence was inadmissible to establish the alleged agreement between Farney and defendants and, in any event, that Farney had no authority to enter into such an agreement which would be binding on plaintiff. Plaintiff also contends that its feed was not moldy and further that any damages allowed defendants would have to be based upon speculation and conjecture.

█ At the outset it should be noted that the burden of proof is upon the defendants to establish their counterclaim by a preponderance of the evidence. United States v. H. R. Henderson & Co., D.C.W.D.Ark., 126 F.Supp. 626, 635.

█ As to defendants' contention that the white turkeys were actually owned by plaintiff and that defendants were merely brooding them, the Court must sustain plaintiff's contention that the parol evidence rule prohibits testimony concerning the alleged oral agreement between Farney and defendants since the oral agreement would tend to contradict or vary the terms of the written agreement entered into by the parties. At this point the Court might state that during the course of the trial, which was without a jury, the Court, over the objections of the plaintiff, permitted the defendants to introduce proof of the alleged oral agreement between them and Farney. This action of the Court was in accord with the rule followed in this Circuit that in a nonjury case the court should be extremely liberal in permitting introduction of evidence, but that the court's decision should not be based upon incompetent evidence. Loc-Wood Boat & Motors, Inc., v. Rockwell, 8 Cir., 245 F.2d 306, 311; Green v. Dingman, 8 Cir., 234 F.2d 547, 553.

Therefore, the Court must now determine whether the evidence concerning the alleged oral agreement is competent and may be considered by the Court in reaching its decision. The parol evidence rule prohibits the admission of parol evidence to vary, add to, or contradict a written instrument. See Comment, 4 Ark. Law Review 168. In speaking of the parol evidence rule, the court in Hoffman v. Late, 222 Ark. 395, 396, 260 S.W.2d 446, 447, said:

"It is the accepted present-day view that the parol evidence rule is not really a rule of evidence but is instead a rule of substantive law. Wigmore on Evidence (3d Ed.), § 2400; Williston on Contracts (Rev. Ed.), § 631; Rest., Contracts, § 237; 4 Ark.L.Rev. 168. As Wigmore puts it, supra: 'What the rule does is to declare that certain kinds of facts are legally ineffective in the substantive law; and this of course (like any other ruling of substantive law) results in forbidding the fact to be proved at all.' The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation

by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing.

"Hence in the case at bar it makes no difference whether Late's version of the oral negotiations is true or false."

See, also, Roth v. Prewitt, 225 Ark. 466, 469, 283 S.W.2d 155.

In the instant case the parties entered into a written agreement consisting of the "Application for Turkey Financing" executed by defendants on January 12, 1956, and the acceptance of said application by plaintiff on February 13, 1956. Among other things the application provided:

"This application when accepted by Albers Milling Company and Chattel Mortgage executed by applicant, shall constitute the entire agreement of the parties hereto, and no agent of either party hereto has authority to alter or change the terms hereof and neither party is or shall be bound by any statement or representation not in conformity herewith."

The alleged oral agreement between Farney and the defendants clearly would contradict the terms of the written agreement, and the Court is prohibited from considering the parol evidence tending to establish the oral agreement.

Defendants contend that the parol evidence rule does not apply, and in support of their contention defendants rely upon the following cases: Newell Contracting Co. v. Elkins, 161 Ark. 625, 257 S.W. 54; Breckenridge & Brashears v. Hearne Timber Co., 135 Ark. 31, 204 S.W. 981; Marianna Hotel Co. v. Livermore Foundry & Machine Co., 107 Ark. 245, 154 S.W. 952; Trumbull v. Harris, 102 Ark. 669, 145 S.W. 547; St. Louis, Iron Mountain & Southern Ry. Co. v. Wynne Hoop & Cooperage Co., 81 Ark. 373, 99 S.W. 375.

The authorities relied on by defendants have no application to the facts in the instant case. Here, as heretofore noted, the application executed by defendants specifically provided that when it was accepted by plaintiff, it would constitute the entire agreement of the parties and that no agent had authority to alter or change the terms thereof.

In Burton v. Burns, 201 Ark. 97, 99, 143 S.W.2d 874, 875, the court said:

"Appellees leased the bulk plant and ground for their service station from Sloan under a written contract, in which they agreed to and did pay Sloan $30 per month. If the bulk plant were pledged to them, why was it not mentioned in the lease? It appears to us that this is an effort to vary the terms of both the written petroleum sales contract, of April 1, 1936, in which one paragraph states, 'This contract contains the entire agreements of the parties hereto. There are no oral promises or warranties affecting it and none shall be valid,' and the written lease contract covering the operation of the bulk plant, which, it is conceded, cannot be done. It is also claimed that Sloan breached the petroleum sales contract by failing to drum up business for him in his territory, but the contract makes no such provision, and neither contract provides for a pledge of the property.

"We conclude, therefore, that there was no pledge."

In view of the specific provision in the application executed by defendants and accepted by plaintiff, defendants are precluded from introducing parol evidence of the alleged oral agreement which would contradict the terms of the written agreement, and, as above stated, the Court is precluded from considering such parol evidence in the disposition of this case.

Moreover, even if the Court could consider the parol evidence, defendants would be in no better position since there was absolutely no evidence to establish that Farney had either real or apparent authority to enter into such an agreement on behalf of the plaintiff.

In United States Bedding Co. v. Andre, 105 Ark. 111, 115, 150 S.W. 413, 414, 41 L.R.A.,N.S., 1019, the court said:

"A person dealing with an agent is at once put upon notice of the limitations of his authority, and must ascertain what that authority is. Berry v. Barnes, 23 Ark. 411; City Electric Street Railway Co. v. First National Exchange Bank, 62 Ark. 33, 34 S.W. 89, 31 L.R.A. 535.

"Such person cannot presume that such authority exists; he cannot rely upon the representation of the agent as to what his authority is; he must make inquiry and use due diligence to learn the nature and extent of such authority. If he does not, he deals with the agent at his own risk; and if the authority of such agent is disputed it devolves upon him to prove it."

See, also, International Harvester Co. of America v. McLaughlin, 182 Ark. 1122, 34 S.W.2d 452; J. T. Fargason Co. v. Dudley, 173 Ark. 1148, 1159, 294 S.W. 6; American Southern Trust Co. v. McKee, 173 Ark. 147, 161, 293 S.W. 50.

In view of the parol evidence rule and the lack of authority on the part of Farney, the Court cannot sustain defendants' contention that the plaintiff was the owner of the white turkeys. There appears to be no contention that the white turkeys were damaged by eating moldy feed. In fact, Donaldson testified that most of the white turkeys were "sick all the way through" and that "a lot of the cause was hereditary". He also stated that he did not know if the white turkeys were affected any by moldy feed. It follows that defendants' counterclaim based upon the white turkeys is without merit.

 With regard to the bronze turkeys defendants contend that they sustained the loss of profits because the turkeys became sick and stunted after eating moldy feed purchased by defend-

ants from plaintiff. It is not clear from the defendants' counterclaim or from their brief whether this claim is based upon an alleged breach of warranty or upon a theory that the plaintiff was guilty of negligence in manufacturing the feed.

If the counterclaim is based upon breach of warranty, there is a serious question as to whether defendants could proceed against the plaintiff. Under the Arkansas law there must be privity of contract between the purchaser and the seller before the purchaser can maintain an action against the seller for breach of warranty. See Green v. Equitable Powder Mfg. Co., D.C.W.D.Ark., 95 F. Supp. 127, 132. In the instant case the alleged moldy feed was purchased by defendants from Johnson while the latter was acting as dealer for plaintiff, and there is some doubt as to whether there was any privity of contract between defendants and plaintiff.

If defendants' counterclaim is based upon negligence, there was absolutely no evidence that the plaintiff was guilty of negligence in the manufacture or distribution of the feed.

It is true that there was evidence that some of the feed was caked and appeared to be moldy. However, there was no evidence that the feed was ever analyzed to establish the existence or nonexistence of mold, and it was established that the fact that the feed was caked did not necessarily mean that mold was present.

Nevertheless, even assuming that there was mold in the feed and that the plaintiff was either guilty of negligence or breach of warranty, defendants would be in no better position.

Defendants' witnesses established that the bronze turkeys had two diseases: (1) enteritis, and (2) mycosis. Enteritis can be a primary disease, and the cause of enteritis is not known. Thus, it is impossible to say that moldy feed caused the turkeys to have enteritis.

Mycosis can be caused by mold, but according to defendants' witness it can

also be caused by stagnant water and litter. It was further established that the type of mold which causes mycosis is present in the air, on the ground, and in water. And defendants' own witness testified that the usual cause of mold is in the litter around and under the water troughs. It was further established that defendants purchased some feed from other sources.

When all these factors are considered it becomes readily apparent that if the Court were to allow defendants damages on their counterclaim, such allowance would necessarily be based on speculation and conjecture as to the cause of the damages. Of course, the Court cannot reach a judgment in such a manner. United States v. H. R. Henderson & Co., supra, at page 637 of 126 F.Supp.; Jonesboro Coca-Cola Bottling Co. v. Hambrooke, 206 Ark. 385, 175 S.W.2d 387; Jonesboro Coca-Cola Bottling Co. v. Young, 198 Ark. 1032, 132 S.W.2d 382; Franke's, Inc., v. Bennett, 201 Ark. 649, 146 S.W.2d 163.

In Jonesboro Coca-Cola Bottling Co. v. Young, supra, the court at page 1036 of 198 Ark., at page 384 of 132 S.W.2d, said:

" 'The damages recovered in any case must be shown with reasonable certainty both as to their nature and in respect of the cause from which they proceed. No recovery can be had where it is uncertain whether the plaintiff suffered any damages unless it is established with reasonable certainty that the damages sought resulted from the act complained of. Hence, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether the damages resulted from the act of which complaint is made or from some other cause, or where it is impossible to say what, if any, portion of the damages resulted from the fault of the defendant and what portion from the fault of the plaintiff himself.' 15 Am.Jur. 413."

It follows from the above that defendants are entitled to no relief on their counterclaim and that plaintiff is entitled to recover judgment against the defendants in the sum of $8,761.10.

Plaintiff also contends that it is entitled to six percent interest from January 31, 1957. In view of the relationship between the parties and the circumstances of this case, the Court is of the opinion that interest should not begin to run until the date of the judgment herein.

### Conclusions of Law

**1.**

The Court has jurisdiction of the parties and the subject matter herein.

**2.**

Plaintiff is entitled to recover the sum of $8,761.10 of and from the defendants.

**3.**

Defendants are not entitled to recover on their counterclaim and said counterclaim should be dismissed.

A judgment in accordance with the above should be entered.