**Gary SHELTON, Plaintiff,**

v.

**VALMAC INDUSTRIES, INC., Defendant.**

**Civ. No. 81–2190.**

United States District Court, W. D. Arkansas, Fort Smith Division.

May 11, 1982.

Wayland A. Parker, Greenwood, Ark., for plaintiff.

Phillip Carroll, Rose Law Firm, Little Rock, Ark., for defendant.

### MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an action by Gary Shelton against Valmac Industries, Inc., alleging that Mr. Shelton, a citizen and resident of Waldron, Scott County, Arkansas, was induced, in

1973 and early 1974, by certain promises and statements made by Valmac employees to become a grower or producer of broilers for defendant, Valmac. It is alleged in the complaint that the defendant, by and through its agents, servants and employees, induced plaintiff to become a broiler grower or producer by promising him a long-term contract and business association with the defendant with a good profit or high income. It is alleged that the plaintiff relied on such representations and in reliance thereon made an investment of $21,730.00 in a broiler house for the production of broilers.

It is claimed that during the year 1976 the plaintiff became interested in constructing a second broiler house and again contacted the defendant to determine whether it would be willing to furnish baby chicks and process the broilers produced in the second house if the house was built. It is alleged that the defendant agreed for the plaintiff to build the second house and agreed to furnish baby chicks and process the broilers under the same terms of the first agreement, and that at such time the defendant was aware that the second broiler house would cost the plaintiff $28,000.00 to $30,000.00. It is claimed that defendant was aware that the plaintiff would suffer a severe financial loss should he construct the broiler house and be terminated by the defendant prior to recovery of his investment through profits from growing and producing broilers under a contract with the defendant.

The plaintiff alleges in the complaint that:

Defendant promised the plaintiff that plaintiff would remain a grower and producer of broilers for the defendant for so long as defendant operated the Valmac plant at Waldron, Arkansas, provided that plaintiff maintained and conducted his grower or producer operation in accordance with the standards of operations contained in certain year-to-year successive written contracts with the term of each being for that period required for producer to grow and deliver one lot or flock of broilers.

On or about February 16, 1978, the defendant terminated plaintiff as a broiler grower for it, and plaintiff claims damages as a result of such termination of $649,-730.00.

Defendant removed the matter to this Court under the provisions of 28 U.S.C. § 1332 by reason of sufficient jurisdictional amount and diversity of citizenship. Defendant then answered the complaint, essentially denying all material allegations and alleging, among other things, that the written agreement contained the entire agreement between the parties.

On April 23, 1982, the matter was tried to the Court without a jury, the parties having waived their right to a jury trial. After hearing the evidence, the Court requested that the parties file briefs supporting their position within fourteen (14) days of the date of the trial. No brief was received from plaintiff within the time permitted, but defendant's brief has been received. The Court, after considering the evidence in the case, makes and files its findings of fact and conclusions of law separately stated.

## FINDINGS OF FACT

1. In 1973 and early 1974, the plaintiff had discussions with representatives of Valmac Industries, Inc., about constructing a broiler house to be used in the production of broilers for the defendant. As a result of such discussion, the defendant advised the plaintiff that it would, if such house was constructed, provide to the plaintiff baby chicks to be grown by him pursuant to the standard contract that the company was entering into with broiler growers at such time.

2. That subsequent to such discussions, the plaintiff talked with the Farmers Home Administration in Waldron about financing the house and was advised that he would have to provide a letter from Valmac Industries advising that baby chicks would be placed in the house by them if the house was financed and built.

3. That after discussions with the defendant's agents, Charles Rushing, Waldron Complex Manager for defendant, wrote the FHA a letter dated October 31, 1973, which stated:

We are taking on new broiler producers for our Waldron operations at this time. I talked with Mr. Otis Gary Shelton October 31, 1973, and he agreeded [sic] that he would build and equip a new broiler house to our specifications. I agreeded [sic] to issue him a broiler contract when he has completed the house.

If more information is needed, please give us a call.

(Plaintiff's Exhibit 6).

4. That the FHA then agreed to finance the construction of the house, and on January 29, 1974, the plaintiff executed a promissory note (Plaintiff's Exhibit 3) in the principal amount of $34,940.00, agreeing to make payments called for in the note. The note was secured by a mortgage on certain real estate on which the house was located owned by Mr. Shelton (Plaintiff's Exhibit 9).

5. That plaintiff then spent $21,730.00 in constructing a broiler house to be used in the production of broilers, and defendant entered into its standard broiler contract with plaintiff, calling for, among other things, it to provide baby chicks owned by it to the plaintiff for plaintiff to grow to maturity. The contract called for certain payments to be made to the plaintiff for his labor and the use of his facility and other services performed in the growing of such broilers.

6. That in late 1975, the plaintiff became interested in constructing another broiler house in which to grow chickens under a contract with defendant, and, after discussions with agents of Valmac, Mr. Shelton again contacted FHA in Waldron, Arkansas, and was again advised that he would be required to furnish another letter from Valmac advising that it would place chicks in a new house to be constructed if same was financed and constructed. By letter dated September 29, 1975, Norbert L. Flusche, Live Production Manager of the defendant, wrote FHA as follows (Plaintiff's Exhibit 7):

Mr. Gary Shelton is interested in constructing another broiler house. If he does and it is equipt [sic] to our specifications, we will place broilers in it on our regular broiler contract.

7. That FHA then subsequently financed the new house and on March 4, 1976, the plaintiff executed another promissory note in the principal amount of $28,000.00, calling for payments to be made as provided for in the note (Plaintiff's Exhibit 4). This indebtedness was also secured by a mortgage on the farm.

8. That it was the custom of the parties to annually execute a written contract, and Plaintiff's Exhibits 1 and 2, introduced into evidence at the trial, are typical of the contracts which the parties operated under during their business relationship. Plaintiff's Exhibit 1 was the contract that was in force at the time that the business relationship between the parties was terminated.

9. That on February 15, 1978, the catching crew came to plaintiff's houses, after notification to plaintiff, to catch and remove the broilers which had been grown by the plaintiff, and found that the condition of the houses was not good. For reasons which are in dispute, the houses were in a wet and sloppy condition. The supervisor of the catching crew requested that the plaintiff spread hay to make it easier to catch the chickens, and the plaintiff pointed at his barn and went to his home and apparently went to bed. The crew, after catching a good portion of the chickens, declined to catch the remainder and left a number of the chickens in one of the houses.

10. That the feeders and waterers had been raised to make it possible for the catchers to operate, and although the plaintiff knew that all chickens had not been removed from one of the houses, he did not lower the waterers or feeders so that the broilers could have access to feed and water, and the broilers were without feed and water until they were subsequently picked up by the catching crew approxi-

mately 24 hours after the waterers and feeders had been raised by plaintiff.

11. That by letter dated February 17, 1978, Norbert Flusche advised plaintiff that their business relationship was being terminated and the contract terminated and stated that the reason was that the plaintiff failed to properly care for the chickens during the 24-hour period when they were out of feed and water because of the raised waterers and feeders. He cited as authority for the termination paragraph 2–B of the contract between the parties.

12. That plaintiff's houses were out of production for approximately three and one-half batches of chickens, but plaintiff furnished no evidence relative to the losses incurred by him by reason of his houses being out of production for such time. He was only able to furnish gross figures at the trial and did not furnish any evidence of expenses from which his net profit or net income could be determined for any batch of chickens.

13. That on September 1, 1978, the defendant entered into its standard contract with Erie Shelton, plaintiff's mother, and broilers have been grown in such houses in her name since such time. Plaintiff testified that, although the broilers were in his mother's name, he and his family largely cared for them and the relationship was practically the same as before his relationship with defendant was terminated. He testified that during the three and one-half years since he was terminated, he had been required to pay his mother approximately $8,000.00 to care for the chickens, but he testified that he had been paying her some unspecified amount prior to this arrangement.

## DISCUSSION

The facts as adduced at the trial in this case are not in material dispute. It is true that there is a dispute between the parties as to what precipitated the defendant's decision to terminate the business relationship between the parties, but the Court finds that what precipitated the termination is not material. It makes no difference why the defendant decided to terminate the contract and its relationship with the plaintiff because it is undisputed that the contract entered into between the parties gives the defendant the absolute right to terminate the contract at the conclusion of the growing out of any batch or flock of broilers. Paragraph 12 of the contract provides:

12. *Term of Contract.* The term of this Agreement is for that period required for Producer to grow and deliver one (1) lot or flock of broilers. It shall automatically renew for a like successive term unless cancelled by either party in writing within thirty (30) days after date of slaughter. The Company decision in renewing and its timing for the next flock may be based, among other things, upon the following:

A. Supply and Demand for Broilers.

B. A Producer who fails to earn two cents per net pound for two (2) consecutive batches of broilers will be placed on probation for one (1) batch. If he does not earn the base price on this batch, he may be dropped at the discretion of the Company. A Producer who fails to earn the base price for four (4) consecutive batches will be placed on probation for one (1) batch. If he does not earn the base price on this batch, he may be dropped at the discretion of the Company.

C. Economic considerations, including, but not limited to, location and type of production facilities.

There was considerable testimony at the trial, adduced by the attorneys for each of the parties, relative to the reasons for plaintiff entering into the contract with the defendant, and the discussions that they had prior to execution of the contract, and substantial evidence on the question of why the contract was terminated and whether the reasons given by the defendant for doing so were correct, but the Court is at loss to understand what that has to do with this case. It should be pointed out that all of this testimony relative to prior negotiations was received without objection even though

the Court believes that the receipt of such evidence was a violation of the parol evidence rule. However, since this case was tried without a jury, even if there had been an objection to the parol evidence which was introduced, the Court would have, in all likelihood, admitted the evidence, but would not have considered it in determining the result to be reached. As stated by Judge John E. Miller in *Albers Milling Company v. Donaldson*, 156 F.Supp. 683 (1957), a case with facts exceptionally similar to the facts in this case:

At this point the court might state that during the course of the trial, which was without a jury, the court, over the objections of the plaintiff, permitted the defendants to introduce proof of the alleged oral agreement between them and Farney. This action of the court was in accord with the rule followed in this circuit that in a non-jury case the court should be extremely liberal in permitting introduction of evidence, but that the court's decision should not be based upon incompetent evidence. (Citing cases)

During the trial of this matter, the attorneys for both of the parties seemed to be proceeding under the belief that paragraphs 8 and 9 of the contract controlled, but the Court reads these provisions to apply only if the defendant desires to terminate the contract before a batch or flock of chickens has been grown to maturity. Paragraph 12 applies where the parties find themselves between batches or flocks. When the parties are between batches or flocks, all that either party was required to do to terminate the contract was to give the other party notice in writing within 30 days after the slaughter of that batch or flock of chickens. Thus, either party had an absolute right to terminate the contract, provided they complied with the notice provisions, with or without cause, at the termination of the growing of any flock or batch.

While the Court does not believe that the testimony offered by the plaintiff on this point was substantial, and certainly did not preponderate in his favor, the Court recognizes that there was evidence intro-duced by him which he believes indicates that the defendant induced him to make the expenditures for the houses which he constructed upon the representation that he would be retained as a grower for the defendant so long as it remained in business in the Waldron area, or at least until he was able to pay the indebtednesses incurred to construct the houses. While, as the Court has already pointed out, this evidence was introduced without objection, the Court believes that it is a violation of the parol evidence rule and, for this reason, the Court cannot consider it in a case, such as this one, where the parties have reduced their earlier oral agreements to writing. The law is well settled that even though this rule is denominated a rule of evidence, it is, in fact, a rule of substantive law. Of course, in determining this matter, this Court must apply the law of Arkansas. In *Hoffman v. Late*, 222 Ark. 395, 396, 260 S.W.2d 446, 447, the Arkansas Supreme Court stated:

It is the accepted present-day view that the parol evidence rule is not really a rule of evidence but is instead a rule of substantive law. Wigmore on Evidence (3d Ed.), § 2400; Williston on Contracts (Rev.Ed.), § 631; Rest., Contracts, § 237; 4 Ark.L.Rev. 168. As Wigmore puts it, supra: "What the rule does is to declare that certain kinds of facts are legally ineffective in the substantive law; and this of course (like any other ruling of substantive law) results in forbidding the fact to be proved at all." The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing.

Hence in the case at bar it makes no difference whether Late's version of the oral negotiations is true or false.

Thus, even though there was no objection to the evidence relative to prior and contemporaneous oral agreements between the parties, since the agreement was reduced to writing, the Court cannot and will not con-

sider that evidence, not only for the reasons stated by Judge Miller in the *Albers Milling* case, *supra*, but, more importantly, because Arkansas law clearly is that, the parol evidence rule being a rule of substantive law, such parol evidence cannot be considered by the Court, under most circumstances, in construing the agreement between the parties. *See also City of Crossett v. Riles*, 261 Ark. 522, 549 S.W.2d 800 (1977), and *Brown v. Aquilino*, 608 S.W.2d 35 (Ark.App.1980).

While the briefs of neither of the parties have called to the Court's attention these cases, there have been at least three cases construing Arkansas law on point. In *Farmers Cooperative Association, Inc. v. Garrison*, 248 Ark. 948, 454 S.W.2d 644 (1970), a case involving the growing of laying hens under a contract, the Arkansas Supreme Court held that evidence of prior and contemporaneous oral discussions between the parties was not admissible, because of the parol evidence rule, to vary the contract which was reduced to writing and executed by the parties.

In the *Albers Milling* case, *supra*, the Court was faced with a case almost identical to this case, with the only real difference being that the relationship between the parties called for the growing of turkeys rather than broilers. As has already been pointed out above, Judge Miller, recognizing that the parol evidence rule was, in fact, a rule of substantive law, refused to consider the parol evidence which was introduced in construing the contract between the parties.

In *Starling v. Valmac Industries, Inc.*, 589 F.2d 382 (1979), a case with facts startlingly similar to the facts in this case, the Court of Appeals for the Eighth Circuit also applied the parol evidence rule and affirmed the trial court's refusal to allow parol evidence to vary the terms of a written contract entered into between the parties. Because the facts in that case are so similar to those in this one, even involving a contract by the same defendant which was almost identical to the contract in this case, the Court feels that it is worthwhile to set forth in some detail the facts of that case. Judge Henley described the relationship between the parties as follows:

Prior to 1970 Mr. Starling was receiving birds, feed and medicines from the defendant, Valmac, and for many years prior to 1970 Starling had dealt with Valmac or its corporate predecessors, including a concern operating out of Greenville, Mississippi, which is a relatively short distance from Ashley County, Arkansas. The relations between Mr. Starling on the one hand and Valmac and its predecessors on the other hand were mutually satisfactory.

In the broiler business agreements between processors and growers are evidenced by written contracts. Each contract is geared to a particular "batch" of baby chicks placed with the grower. Ordinarily, the contract is renewed automatically "from batch to batch" unless terminated by one of the parties. A renewed contract between Valmac and a grower is signed by Valmac but is not necessarily signed by the grower who is simply given a copy of the document when a new batch of chicks is placed. Where contract terms are changed substantially, it is required that both sides sign the new contract. In its contracts Valmac specifically reserved the right to terminate or not to renew if grower performance became unsatisfactory or if severance of the relationship should be dictated by market conditions. However, Valmac's right to terminate an arrangement was not limited to the two situations just mentioned.

As of 1970 Starling conducted his broiler operation in three small, old and apparently deteriorating chicken houses which had become or were becoming unsuitable for the growing out of broilers. Mr. and Mrs. Starling, with the encouragement of Valmac, applied to the Farmers Home Administration (FHA), an agency of the United States, for a substantial loan to enable them to construct a new and modern chicken house and to have a deep water well drilled on their premises. The loan applied for amounted to $17,500, and repayment of it was to be

secured by a mortgage on forty acres of land in Ashley County owned by Mr. Starling or by both Mr. and Mrs. Starling.

Naturally, before making such a loan FHA desired to know whether Mr. and Mrs. Starling were going to be able to continue to receive baby chicks to be grown out, and that question was not without interest to Mr. and Mrs. Starling. Accordingly, the lending agency and the Starlings contacted a representative of Valmac and were advised in general terms that if the Starlings continued to be satisfactory producers there was no reason to believe that Valmac would not continue to supply them with baby chicks. However, Valmac's representative, Jack Nelson, did not purport to bind his company to furnishing chicks to Mr. and Mrs. Starling as long as Valmac stayed in business, or over the life of the anticipated loan, or for any other particular length of time. The County Supervisor of FHA evidently did not consider that the Starlings or the agency had any such commitment; he did feel, however, that he could count on continued delivery of chicks by Valmac to the Starlings for a substantial period of time during the life of the loan.

Just as in this case, even though there had been a financing of the additional houses by FHA based upon the letter written by representatives of Valmac, Valmac terminated its contract with the grower, and plaintiff sued, alleging that she was induced to spend large sums to construct the new houses upon the representations of Valmac that it would continue to do business with them and to place chicks in the houses "during foreseeable business future if defendant continued in business and if plaintiff and her husband continued to be satisfactory producers of broiler chickens."

The Court of Appeals, applying Arkansas law, stated:

A party to a written contract may not introduce parol evidence of promissory representations of the other party for the purpose of varying the terms of the written instrument. But, where the promissory representations were made fraudulently for the purpose of inducing the party sought to be charged to enter into the contract, such representations may be proved by parol evidence as a defense to an action on the contract. *Garrison, supra,* 454 S.W.2d at 648–49.

Judge Henley's conclusion is particularly appropriate in this case:

However, we go beyond that conclusion. Leaving the parol evidence rule, as such, out of the case and assuming that the defendant's motion *in limine* had never been filed, and that the plaintiff had been permitted to introduce all of the testimony that she wanted to introduce, and that at the conclusion of her case the defendant had elected not to introduce any evidence, we think that the district court would have been required to instruct a verdict in favor of the defendant had a motion for such relief been made.

In our estimation, the most that can be said from plaintiff's standpoint is that she and her husband had a reasonable expectation in 1970 that other things being equal they could expect to continue to receive chicks from Valmac during the foreseeable business future if Valmac continued in business and if Mr. and Mrs. Starling continued to be satisfactory producers. That expectation, however, did not amount to a contract right, and Mr. and Mrs. Starling had no reason to think that it did.

For the above reasons, the Court has concluded that it has no choice but to deny the plaintiff any relief in this case because, to do otherwise, would fly in the face of well-settled Arkansas law.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and of the parties herein.

2. That the contract entered into between the parties and introduced as Plaintiff's Exhibit 1 grants to the defendant the unequivocal right to terminate the contract, with or without cause, at the conclusion of the growing of any batch or flock of broilers, provided that notice in writing is given within 30 days after the date of slaughter of such batch or flock.

3. That defendant complied with the terms and provisions of the contract relative to cancellation.

4. That the plaintiff is not entitled to recover any sum from the defendant by reason of such termination.

A separate judgment in accord with this memorandum opinion will be entered.

### JUDGMENT

On this 11th day of May, 1982, for the reasons stated in the memorandum opinion filed contemporaneously herewith, the Court finds that the plaintiff should recover nothing on his complaint filed herein and that this matter should be and it hereby is dismissed with prejudice.

IT IS SO ORDERED.