**SIMMONS FOODS, INC., Appellant,**

v.

**HILL'S PET NUTRITION, INC., Appellee.**

No. 01–1375.

United States Court of Appeals, Eighth Circuit.

Submitted: Sept. 10, 2001.

Filed: Oct. 30, 2001.

Vicki Bronson, argued, Fayetteville, AR (John R. Elrod, on the brief), for Appellant.

Steven D. McCormick, argued, Chicago, IL, for Appellee.

Before BOWMAN, HEANEY, and BYE, Circuit Judges.

BYE, Circuit Judge.

Simmons Foods, Inc., (Simmons) an Arkansas corporation that produces pet food poultry meal, sued Hill's Pet Nutrition, Inc., (HPN) a Kansas corporation that produces and markets pet foods, for breach of contract and promissory estoppel. Simmons claimed that HPN breached the last two years of an alleged three-year contract for the sale and purchase of poultry meal. Simmons also claimed that HPN orally promised a long-term business relationship. Simmons sought to recover the value of business improvements made in reliance on that promise. The district court[1] granted summary judgment in favor of HPN on both claims. We affirm.

## BACKGROUND

Poultry by-product meal is the main ingredient in HPN's Science Diet® and Prescription Diet® pet foods. HPN started buying poultry meal from Simmons in 1986; at that time HPN obtained poultry meal from a number of suppliers under short-term (monthly or bimonthly) contracts. By 1988 or 1989, Simmons had modified its processing for "regular ash" poultry meal in accordance with HPN's specifications, and became one of HPN's regular suppliers. About the same time, HPN began negotiating longer-term contracts with fewer suppliers, one of which was Simmons. In early 1990, HPN and Simmons entered their first long-term written contract, a two-year agreement.

The first long-term contract was an "output" contract whereby HPN agreed to purchase all poultry meal produced by Simmons at its facility in Southwest City, Missouri. After the first contract expired in 1992, the parties entered into a series of one-year contracts through 1997. Some were "output" contracts like the first; at least one was a "requirements" contract whereby Simmons agreed to supply the needs of HPN's Los Angeles plant.

In 1995, Simmons began expanding its operation to produce "low ash" poultry meal. "Low ash" is a higher, more expensive grade poultry meal than "regular ash," and requires machines called "classifiers" to remove ash from the poultry meal during the production process. Simmons expanded its operation because HPN needed "low ash" meal and wanted Simmons to produce it. At the time of these additional investments, Simmons contemplated asking HPN for a long-term contract to recoup money spent on improvements, but decided against it. Simmons's Chairman, Mark Simmons, when asked if Simmons requested a long-term supply agreement from HPN, answered, "I know we talked about the pros and cons of it internally, a little bit. I don't think that we actually asked them for a long term contract, no." Supp.App. 171. Simmons's Chief Operating Officer, Gene Woods, admitted that Simmons continued to negotiate one-year agreements following the expansion project:

Q: . . . And you made your investments in the expansion and in the classification during 1995 and 1996; true?

A: We made expenditures for those items, yes.

Q: And when you came around to negotiating the contract for 1997, you

**1.** The Honorable H. Franklin Waters, Senior United States District Judge for the Western District of Arkansas.

once again negotiated a one year contract; correct?

A: Yes.

Supp.App. 156.

In the fall of 1997, the parties met to discuss the 1998 contract. HPN had just recently hired a new buyer, Rhett Butler, who brought with him a new purchasing philosophy. HPN had initiated "Focus 75," a program under which HPN hoped to reduce the cost of doing business by $75 million over a three-year period. HPN asked its principal suppliers, including Simmons, to reduce supply costs to meet that goal. In November 1997, after the contract meetings, Simmons sent HPN a fax that stated:

Below are the general terms of our agreement, as we understand it, for the purchase of Poultry By–Product Meal from Simmons Foods, in Southwest City, Mo for the next three (3) years:

1. Both Simmons and Hills have agreed to join together in a (sic) effort to find at least 3% cost saving per year over the next three (3) years in the production, handling and usage of Poultry By–Product Meal.

2. It is the intent of both parties to have products that are more economical through cost saving and to share in that cost saving.

3. Cost saving for 1999 and 2000 will be explored by representatives from both companies working together in an organized "team effort." This team should be formed ASAP and certainly before the end of January 1998.

4. The 3% cost saving for 1998 will be expressed by each company absorbing 1.5%. Simmons will reduce prices by 1.5% of the 3% cost saving for 1998.

5. Volumes for 1998 will be 36.6 million pounds of Low Ash Poultry Meal for Richmond and 14 Million pounds of Reg-

ular Ash Poultry Meal for Bolling (sic) Green. Please forward a copy of your PO at your convenience.

Based on the above information, Simmons will price 1998 Low Ash at $591.00 per ton and Regular Ash at $522.00. We look forward to working with you on this project.

App. 12–13.

HPN responded with two purchase orders for the 1998 contract year. Unlike the parties' previous contracts, the terms of these purchase orders did not refer to Simmons's "output" or HPN's "requirements." Instead, one purchase order referred to the specific quantity of low ash meal set forth in the November 1997 fax (36.6 million pounds) and the other referred to the specific quantity of regular ash meal set forth therein (14 million pounds). Both parties fully performed the 1998 contract.

In the fall of 1998, when the parties met to discuss prices for the year 1999, the relationship became estranged. HPN's buyer, and buying philosophy, had changed again. Bill Ziehm now represented HPN. Ziehm wanted more than a 3% reduction from the prices set forth in Simmons's November 1997 fax and HPN's 1998 purchase orders. Ziehm indicated that Simmons would have to agree to a substantial price reduction, or risk termination of its relationship with HPN. On December 4, 1998, Simmons wrote to HPN to confirm a six-month agreement from January 1 through June 30, 1999. Instead of fixed prices, the parties agreed that pricing would be based on the Chicago Board of Trade index prices. This contract resulted in prices substantially less than the 3% reduction per year that Simmons set forth in the November 1997 fax.

When the parties were unable to reach an agreement for the sale and purchase of poultry meal beyond June 30, 1999, Sim-

mons sued HPN alleging breach of contract for the years 1999 and 2000. Simmons alleged that the November 1997 fax set forth a three-year deal, and claimed damages for 1999 and 2000 in an amount equal to the difference between sales to other customers, and the prices set forth in the November 1997 fax. Simmons also alleged a promissory estoppel claim, seeking to recover the cost of improvements made in 1995 and 1996 to produce "low ash" poultry meal.

HPN moved for summary judgment on both claims, which the district court granted. With respect to the breach of contract claim, the district court held that the November 1997 fax failed to satisfy the Uniform Commercial Code's (UCC) statute of frauds because the fax did not refer to quantities for the years 1999 and 2000. With respect to the promissory estoppel claim, the district court held that evidence of HPN's alleged oral promise of a long-term relationship was barred by the UCC's parol evidence rule because Simmons subsequently entered into one-year written contracts with HPN.

## DISCUSSION

■ We review a district court's grant of summary judgment de novo, applying the same standard as the district court. *Krentz v. Robertson Fire Protection Dist.*, 228 F.3d 897, 902 (8th Cir.2000). This appeal involves the district court's interpretation and application of the UCC's statute of frauds and parol evidence rule, questions of law reviewed de novo. *Kunkel v. Sprague Nat'l Bank*, 128 F.3d 636, 641 (8th Cir.1997).

## I. The Breach of Contract Claim

■ Simmons contends that the November 1997 fax sets forth a three-year contract and that HPN did not perform the last two years of that contract. The district court held that the November 1997 fax did not set forth an enforceable contract for the years 1999 and 2000 because it contained no quantities for those years. We agree. The UCC's[2] statute of frauds provides that a "writing ... is not enforceable under this paragraph beyond the quantity of goods shown in such writing." UCC § 2–201(1). The November 1997 fax sets forth "Volumes for 1998" in the amount of "36.6 million pounds of Low Ash Poultry Meal" and "14 Million pounds of Regular Ash," but contains no quantities for the years 1999 and 2000.

■ Simmons relies upon an exception for contracts that include "term[s] which measure[ ] the quantity by the output of the seller or the requirements of the buyer ..." UCC § 2–306(1). Simmons contends that the November 1997 fax should be construed as an output or requirements contract because of the parties' prior course of dealing—every previous contract between the parties had been an output or requirements contract. The district court held that § 2–306(1) did not apply because, to the extent the November 1997 fax set forth an agreement for the year 1998, the fax indicated an express quantity rather than an output or requirements term like the parties' previous contracts. More significantly, the fax was silent as to any quantity terms (output, requirements, or otherwise) for the years 1999 and 2000. As a result, the district court declined Simmons's invitation to consider parol evidence of the parties' course of dealing to supply the missing quantity term. So

2. The parties agree that the UCC statute of frauds and parol evidence rule are the same in Kansas (HPN's state of incorporation), Arkansas (Simmons's state of incorporation), and Missouri (the location of the Simmons facility that supplied poultry meal to HPN), so we need not engage in a choice-of-law analysis.

must we. "[W]here the writing relied upon to form the contract of sale is totally silent as to quantity, parol evidence cannot be used to supply the missing quantity term." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 794 (4th Cir.1989) (quotation omitted) (applying UCC § 2–201); *Omega Eng'g, Inc. v. Eastman Kodak Co.*, 908 F.Supp. 1084, 1091 (D.Conn.1995); *cf. Essco Geometric v. Harvard Indus.*, 46 F.3d 718, 728 (8th Cir.1995) (holding that a quantity term was present because the writing referred to the "entire" project).

## II. The Promissory Estoppel Claim

 Simmons contends that HPN orally promised a long-term business relationship on more than one occasion, and that Simmons relied upon those promises when it expanded its facilities in 1995 and 1996 to produce "low ash" poultry meal. The district court held that the alleged oral promises of a long-term relationship were barred by the parol evidence rule, UCC § 2–202,[3] because Simmons had subsequently entered into written one-year contracts with HPN. *See, e.g., Shelton v. Valmac Indus., Inc.*, 539 F.Supp. 328, 333 (W.D.Ark.1982) (interpreting UCC § 2–202 under Arkansas law and holding that a plaintiff who entered into a series of written one-year contracts after improving his company, was barred by the parol evidence rule from claiming that the defendant had made representations about a long-term contract). We agree.

Simmons contends that its annual written contracts with HPN were not fully-integrated contracts, and that its contractual relationship with HPN went far beyond the terms of the annual purchase orders the two parties negotiated. Simmons argues that the parol evidence rule does not bar the alleged oral promises because the rule allows a party to explain or supplement written agreements with evidence of the parties' performance, usage, and prior dealings, so long as the evidence does not actually *contradict* the written terms. Simmons contends that the alleged oral promises do not contradict the terms of the written agreements. We disagree. Even if we accept Simmons's contention that the annual contracts were not fully-integrated agreements, the fact remains that one of the express terms included in the written contracts were their length of time, i.e., one year. Simmons wants to introduce parol evidence to prove the parties had a contract with a longer term. But the parol evidence rules clearly provides that a written agreement "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement ... with respect to *such terms as are included* [within the written agreement]." UCC § 2–202 (emphasis added).

## CONCLUSION

We affirm the district court's grant of summary judgment in all respects.

---

**3.** Section 2–202 of the UCC provides, in relevant part, that:

> Terms ... which are ... set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.